No. 106,214

STATE OF KANSAS, *Appellee*, v. MICHAEL MAESTAS, *Appellant*.

(316 P.3d 724)

766

Opinion filed January 24, 2014.

*Christina M. Kerls*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Paul F. Kitzke*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Michael Maestas, Jr., appeals from a first-degree premeditated murder conviction rendered after he admitted stabbing his mother to death. He advances five issues: (1) prosecutorial misconduct; (2) the failure to instruct on a lesser included offense of reckless second-degree murder; (3) alleged infringement on his

right to present his defense; (4) the district court's determination for sentencing purposes that he was not "mentally retarded" under K.S.A. 21-4634; and (5) the district court's refusal to commit Maestas to the state security hospital rather than prison under K.S.A. 22-3430. We affirm.

## Factual and Procedural Background

On August 1, 2009, Maestas placed a 911 call requesting an ambulance at the Hugoton, Kansas, residence he shared with his mother, Lorenza. Maestas told the operator he got carried away, went into Lorenza's bedroom with a knife, and stabbed her. He said she was still breathing. While the call remained connected, Officer Marvin Johnson arrived. Maestas said, "Can you come in please?" Maestas then said, "[Unintelligible] stabbed my mom," and, "[S]he's over here."

Maestas was interviewed by a Stevens County Sheriff's detective. Maestas explained that he called 911 "because I stabbed my mom." He said he used a silver pocket knife. He told the detective Lorenza was asleep in her bedroom with the lights out when he began stabbing her. He said he was lying in his bed and heard voices and these voices were getting to him and it sounded like people were "in there." He then said, "When I walked in[to] her room I just started stabbing and then, like, I just got out of control, I—I didn't stop."

Maestas said he was not sure how many times he stabbed his mother. He told the detective she started screaming during the attack, saying his name and telling him to stop, but he "just lost control and kept stabbing her." He said she fell off the bed and he continued stabbing her. Maestas said he then looked to see if she was still breathing; stood next to her saying he was sorry; washed his hands; returned to talk to her; washed his hands again; and then called 911. He estimated the incident took 10 to 20 minutes.

### Pretrial Proceedings

At a preliminary hearing, the district court found reason to believe Maestas was incompetent to stand trial and ordered him to be evaluated at the state security hospital in Larned, Kansas (Lar-

ned). Based on a report prepared from that evaluation, the district court later concluded Maestas was competent to stand trial.

Maestas engaged his own expert, Dr. Mark Goodman, a licensed psychologist, to perform a competency and psychological evaluation. In his report, Goodman concluded Maestas was oriented to time, place, and person, but had poor intellectual judgment. He concluded: "[Maestas] is well aware, intellectually, of right from wrong." Goodman observed that it was possible Maestas' statements about hearing voices were true and that it was difficult to determine if he intentionally killed his mother because it was possible he acted out against her due to his psychosis. Goodman diagnosed Maestas with "Psychotic Disorder: N[ot] O[therwise] S[pecified]," noting possible borderline intellectual functioning. He also reported that Maestas denied killing his mother. Goodman further concluded that Maestas' psychological disorder played a role in the killing, but due to Maestas' denial the extent it played was unclear.

The State moved for an order in limine prohibiting the parties from discussing at trial Maestas' mental health, well-being, capacity, intent, intelligence, or any disorders he might be alleged to have. In support, the State argued there was no issue about competence following the competency hearing, no evidence regarding insanity or other defenses concerning mental health, and no designated expert regarding Maestas' mental health. It also noted Maestas had failed to file a notice of intent to offer evidence of mental disease or defect excluding criminal responsibility as required by K.S.A. 22-3219. The State specifically argued any lay witness testimony about Maestas' auditory hallucinations would be an attempt to "back-door" evidence barred by statute.

In response, Maestas acknowledged he was not pursuing a diminished capacity defense, but he opposed the motion, arguing he should be able to testify about his own mental state and "offer that kind of evidence." He contended that intent and premeditation were elements to be proved at trial, which made relevant his state of mind at the time of the killing. And he asserted past reports of his auditory hallucinations to lay witnesses were probative of that state of mind. He also argued K.S.A. 22-3219 did not prevent him

or lay witnesses familiar with him from testifying. He claimed that denying him the ability to present this defense would produce "prejudice beyond belief."

The district court granted the State's motion, relying on Maestas' failure to give the notice required under K.S.A. 22-3219. It also granted the motion based on two prior decisions from this court in which we held expert testimony is irrelevant when it does not establish the mental disease or defect impacted the defendant's ability to form intent. See *State v. Pennington*, 281 Kan. 426, 438, 132 P.3d 902 (2006) (expert testimony irrelevant when it does not tend to demonstrate defendant is unable to form requisite intent or does not support mental disease or defect defense as a matter of law); *State v. White*, 279 Kan. 326, 341, 109 P.3d 1199 (2005) (proffered expert testimony sufficient when it showed defendant had a mental disease or defect, people with this disease or defect can lack ability to premeditate and form intent, and defendant's conduct on the date in issue was consistent with someone acting under that disease or defect). The district court said it would strictly construe K.S.A. 22-3219 during trial.

*Trial*

In its case-in-chief, the State put into evidence the audio recording of Maestas' 911 call and a video recording of his interview with the Stevens County detective. Johnson, the police officer who arrived first at the scene, testified Maestas told him Lorenza was in the bedroom and still breathing. Johnson said Maestas removed a knife from his pocket, gave it to the officer, and said, "This is what I did it with." Asked to describe Maestas' demeanor, Johnson said, "I didn't find him to be totally emotional, you know, he wasn't in tears. I just feel like he'd kind of resigned himself to the fact that this happened."

The Stevens County sheriff, who also was at the scene, testified Maestas said he was hearing voices, went into his mother's room, and stabbed her. On cross-examination, the sheriff acknowledged Maestas did not tell him what the voices were saying or otherwise mention anything else about them. The sheriff admitted he had

known Maestas for many years and did not know of any other incidents of violence toward his mother.

The interviewing detective also testified. On cross-examination, defense counsel asked whether Maestas had ever mentioned hearing voices prior to the interview. The State objected and asked the court to order counsel to "narrow the time frame before this witness is asked to answer that question." The detective responded in the affirmative, and defense counsel asked, "And what time prior to this had he mentioned that?" The State objected again. The district court excused the jury and asked the detective what his answer would be. The detective said Maestas had reported hearing voices during most of the detective's dealings with him over previous years. He guessed the last time was 2 or 3 years before the killing. The State argued an event that long ago was irrelevant. Defense counsel countered that the evidence demonstrated Maestas' state of mind, stating:

"[I]t shows a history of him having heard voices. . . . I'm not saying his capacity was reduced, I'm just saying that's how he formed his—if he formed his intent, that's where it came from, and that's all I'm saying. I'm not saying that [he] has a diminished capacity. . . . [T]he question is, where did it come from."

The district court said it would continue to observe K.S.A. 22-3219 but found that because the State had elicited evidence about the voices during direct examination, the door was opened "in some regard, and [Maestas] has every right to conduct a thorough cross-examination in that regard." But the court also ruled an event 3 years prior was irrelevant to Maestas' state of mind at the time of the killing, so it set what it characterized as "a somewhat arbitrary timeframe . . . [of] the days or weeks immediately preceding [the incident]" for such evidence. When cross-examination resumed, the detective testified he had not heard Maestas complain about hearing voices in the 2 weeks prior to the incident. The detective acknowledged he overheard Maestas tell the sheriff at the crime scene about hearing voices.

Dr. Hubert Peterson, a pathologist, autopsied Lorenza and testified concerning the cause of her death. He said she died of blood loss resulting from an estimated 150 stab wounds to her face, neck,

right shoulder, left breast, and abdomen. Peterson said facial wounds "of this nature are often inflicted by someone who knows the decedent. Not always, but often it indicates a familiarity with the deceased."

Maestas called two witnesses in his defense: his sisters Hope Gonzales and Jennifer Maestas. Gonzales testified Maestas had a good relationship with his mother and had no violent tendencies toward her. She said she was aware of incidents when Maestas was hearing voices within "approximately the couple months" before the killing. She testified the voices started getting worse 2 months before the incident but Maestas never told her what the voices were telling him.

Jennifer testified Maestas talked about hearing voices several times within the 60 days before the incident. She said she had never known Maestas to be violent and that he had never exhibited violence toward their mother. She described the relationship between Maestas and Lorenza by saying, "My mother loved us. We're her everything." And as to Maestas' feelings toward Lorenza, Jennifer said, "He had the same love."

Maestas requested jury instructions for three lesser included offenses: voluntary manslaughter, reckless second-degree murder, and intentional second-degree murder. Maestas argued the reckless second-degree murder instruction was appropriate because his actions were "just so reckless" and showed a disregard for any human life, and the evidence established his actions were not intentionally directed at Lorenza; rather, Maestas thought someone else was in the room. The State argued the evidence did not support the instruction because it had proved Maestas realized he was stabbing Lorenza.

The district court agreed to give the voluntary manslaughter and intentional second-degree murder instructions but rejected the reckless second-degree murder instruction based on the lack of evidence of reckless conduct. The jury convicted Maestas of premeditated first-degree murder.

*Sentencing and posttrial determinations*

Maestas moved for a presentence determination that he was mentally retarded under K.S.A. 21-4634, which would have prevented the court from imposing any mandatory prison sentence if Maestas met the stated criteria. K.S.A. 21-4634(a) and (b) call for a mental evaluation and hearing after a district court initially finds sufficient reason to believe the defendant is mentally retarded. The court ordered the evaluation based on testimony from Maestas' expert Dr. Goodman. The court then appointed Goodman and Dr. Gregory Shannon, a licensed psychologist and Larned staff member, to perform the psychiatric evaluations called for by the statute.

In the same motion, Maestas asked the district court to commit him to Larned instead of a Department of Corrections prison. See K.S.A. 22-3430(a) (defendant convicted of a felony may be committed for psychiatric care and treatment instead of imprisonment under certain circumstances). The district court ordered Larned to examine Maestas for this purpose.

Shannon submitted a single report regarding Maestas' intellectual functioning for both the K.S.A. 21-4634 determination of mental retardation and the K.S.A. 22-3430(a) request for psychiatric care and treatment in lieu of prison. At the sentencing hearing, the district court heard testimony from Shannon. It then found Maestas was not mentally retarded and sentenced him to life imprisonment with a minimum 25-year term. The district court also denied Maestas' request for placement at Larned.

Maestas timely appealed. Jurisdiction is proper under K.S.A. 22-3601(b)(1) (off-grid crime). Additional facts will be discussed as applicable to the issue addressed.

## PROSECUTORIAL MISCONDUCT

Maestas argues the prosecutor committed reversible misconduct during closing arguments by mischaracterizing three witnesses' testimony and falsely implying that Lorenza feared Maestas.

*Standard of Review*

Appellate review of a prosecutorial misconduct claim based on improper comments requires a two-step analysis. First, an appel-

late court decides whether the comments at issue were outside the wide latitude a prosecutor is allowed, *e.g.*, when discussing evidence. If so, there was misconduct. Second, if misconduct is found, an appellate court determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013).

Prosecutors enjoy wide latitude in crafting closing arguments. *State v. Scott*, 271 Kan. 103, 114, 21 P.3d 516 (2001) (citing *State v. Miller*, 268 Kan. 517, Syl. ¶ 4, 997 P.2d 90 [2000], *cert. denied* 534 U.S. 1047 [2001]). This latitude allows a prosecutor to make reasonable inferences based on the evidence, but it does not extend so far as to permit arguing facts not in evidence. *State v. Tahah*, 293 Kan. 267, 277, 262 P.3d 1045 (2011). Arguments must remain consistent with the evidence. If they are not, the first prong of the prosecutorial misconduct test is met and on appellate review the court must consider whether the misstatement prejudiced the jury against the defendant and denied the defendant a fair trial. *Bridges*, 297 Kan. at 1012.

Appellate courts consider three factors in analyzing the second step: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. And while none of these factors individually controls, and before the third factor can override the first two, an appellate court must be able to say the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. *State v. McCullough*, 293 Kan. 970, 990-91, 270 P.3d 1142 (2012).

When both constitutional and nonconstitutional error clearly arise from the same acts and omissions, an appellate court begins with a harmlessness analysis of the constitutional error. If the constitutional error is reversible, an appellate court need not analyze whether the lower standard for harmlessness under K.S.A. 60-261 also has been met. *Bridges*, 297 Kan. 989, Syl. ¶ 16. Under both standards, the party benefiting from the error bears the burden to

demonstrate harmlessness. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013).

*Statement about Jennifer's testimony was improper*

Maestas complains that the prosecutor mischaracterized his sister Jennifer's testimony in closing argument by saying she had testified that Maestas had not "returned the favor" of his mother's love. The prosecutor argued the following:

"[T]he sisters . . . said, "Our mother gave us nothing but respect. Our mother was a loving mother. Our mother would have done nothing to Michael, never, she would have never done that. I talked to her everyday [*sic*]. *She loved her children. She said that about her mother. But she didn't say that Mr. Maestas returned the favor. Obviously, he didn't have the same feeling.*" (Emphasis added.)

Maestas is correct. Jennifer actually testified that Maestas never exhibited violence toward his mother. She described his relationship with his mother by saying, "My mother loved us. We're her everything." And specifically as to Maestas' feelings about his mother, she said, "He had the same love."

The prosecutor's argument misstated the sister's testimony, so it was not supported by the evidence. It was improper and constitutes prosecutorial misconduct.

*Statement about Dr. Peterson's testimony was not improper*

Maestas next argues the prosecutor mischaracterized pathologist Peterson's testimony during closing argument by saying the doctor "also made a statement that was unrefuted in the sense that in his examinations, *wounds that are inflicted to the face are of a personal nature.*" (Emphasis added.) The doctor's actual testimony was that wounds to the face "are often inflicted by someone who knows the decedent. Not always, but it often indicates a familiarity with the deceased."

Maestas complains this testimony is different than the prosecutor's claim that the wounds were of a personal nature. The State counters that this comment was not improper under the circumstances because Peterson testified he knew Lorenza was Maestas' mother and the inference that the attack was "of a personal nature"

was logically drawn from the evidence and within the wide latitude afforded to prosecutors.

We agree that one might reasonably infer from Peterson's testimony that Lorenza's wounds were personal in nature; Peterson said the wounds indicated a familiarity with the decedent, and he knew Lorenza was Maestas' mother. The prosecutor's comment did not exceed the professional boundaries our caselaw sets. See *Tahah*, 293 Kan. at 277 (prosecutor has "freedom to craft an argument that includes reasonable inferences based on the evidence").

### *Statement about Johnson's testimony was not improper*

Maestas next contends the prosecutor misled jurors when he argued Detective Johnson had testified that Maestas "appeared to be a person who had just done something wrong." Maestas notes the officer actually told the jury that when he saw Maestas after the incident he "didn't find [Maestas] to be totally emotional, you know, he wasn't in tears. I just feel like he'd kind of resigned himself to the fact that this happened." The State contends its argument was reasonably inferred from the evidence.

We agree with the State. The detective's testimony was that Maestas said, "[T]his is what I did it with," when Maestas handed the officer the pocket knife used in the killing and then took the officer to the bedroom where the stabbing occurred. The prosecutor's comment occurred during the argument on premeditation. We hold that the statement in closing argument was within the reasonable inferences to be drawn from the evidence under the circumstances described.

### *Rebuttal references to "nightmare" and "dream" were not improper*

Finally, the prosecutor argued during rebuttal:

"And ladies and gentlemen, I ask you to look at this. This is not an easy case. The family has lost their mother, have to go through this with their brother. But you have to look at Lorenza Maestas, you have to look at these pictures as a result of Mr. Maestas' actions. *And I wonder, as Mr. Maestas stood above his mother, stabbing her on the bed and on the floor, after she'd screamed for him to stop, was this a nightmare that's coming true, this is a worst nightmare of hers, or was this something that Mr. Maestas had been dreaming of?*" (Emphasis added.)

Maestas argues the italicized comment improperly implied, without evidentiary basis, that Lorenza feared him or had nightmares about him stabbing her while she slept. The State responds that the comment was prompted by Maestas' evidence of his love for Lorenza, and thus was within the wide latitude afforded to prosecutors. It cites *State v. Murray*, 285 Kan. 503, 517, 174 P.3d 407 (2008), in which we held that "no prejudicial error occurs— including prosecutorial misconduct—where the questionable statements are provoked and made in response to prior arguments or statements by defense counsel." It contends the prosecutor's purpose was to "compare the gruesome stabbing committed by Defendant to the love others proclaimed he had for [Lorenza]."

As an aside, we note the State's reliance on *Murray* is flawed. This court overruled the portion of *Murray* on which the State relies several years ago. We now recognize that "a prosecutor commits misconduct by making an improper argument, even if the improper argument is made in response to arguments or statements by defense counsel. The open-the-door rule does not insulate a prosecutor from a finding of misconduct." *State v. Marshall*, 294 Kan. 850, 860, 281 P.3d 1112 (2012). Prosecutors are at all times professionals and have the " 'responsibility of a minister of justice and not simply that of an advocate.' " *State v. Gonzalez*, 290 Kan. 747, 760-61, 234 P.3d 1 (2010) (quoting Kansas Rule of Professional Conduct 3.8, Comment 1 [2009 Kan. Ct. R. Annot. 565]). Prosecutors cannot excuse their own misconduct by arguing their adversary lured them into committing it.

Regardless, we hold the prosecutor's statement here was within the wide latitude to craft arguments based on the evidence. We previously have recognized prosecutors have some freedom to employ colorful language when arguing the State's case. See *State v. Anthony*, 282 Kan. 201, 212, 145 P.3d 1 (2006) (citing *State v. Rodriguez*, 269 Kan. 633, 642-44, 8 P.3d 712 [2000], and *State v. Duke*, 256 Kan. 703, 718, 887 P.2d 110 [1994]). In *Anthony*, for example, the court approved a prosecutor's analogy to a defense counsel's argument to the scene in "The Wizard of Oz" in which the Wizard's giant, floating head, colored smoke, and flashing lights

were revealed to be merely an artifice of a man behind a curtain. 282 Kan. at 211-12.

We view the comment as being a bit nonsensical and speculative, but not improper based on the facts. The victim was asleep in bed when the attack commenced, and the prosecutor was attempting a play on words given that circumstance.

*Prosecutorial misconduct did not deny Maestas a fair trial*

Having determined one comment was improper, we must decide if reversal is required. Our sole focus is on the inaccurate description of Maestas' sister Jennifer's testimony regarding Maestas' love for his mother.

We have repeatedly warned prosecutors to be careful in their characterizations of the evidence, but we do not find this particular infraction gross and flagrant or the product of ill will. See *McCullough*, 293 Kan. at 991 (no ill will when "simplistic" misstatement of law occurred only once); *Wells*, 296 Kan. at 80-81 (no ill will when prosecutor misstated the law twice because statements apparently not intended to undermine jury's application of law, prosecutor referred jury to instructions in case he was mistaken, and no indifference to court rulings demonstrated). There was nothing in the prosecutor's closing arguments to indicate he deliberately misstated Jennifer's testimony.

We further hold that the evidence was so direct and overwhelming that the mischaracterization of Jennifer's testimony did not deny Maestas a fair trial. The jury observed Maestas' admissions that he stopped at his mother's bedroom door, saw her sleeping, entered the room, and repeatedly stabbed her. There is no reasonable probability that the prosecutor's comment about whether Maestas loved his mother would have influenced the jury's verdict. The improper comment was harmless beyond a reasonable doubt.

## RECKLESS SECOND-DEGREE MURDER INSTRUCTION

Maestas argues next that the district court erred by refusing to instruct the jury on the lesser included offense of reckless second-degree murder. He contends the evidence that the house was dark and that he went into his mother's room stabbing in the darkness

supported this instruction. The State argues no rational fact finder could convict Maestas of reckless second-degree murder based on the evidence at trial, so the instruction was not required. We agree with the State.

*Standard of Review*

A trial court must instruct on lesser included offenses upon which the jury could reasonably convict the defendant based on the evidence at trial. This evidence need not be strong or conclusive to warrant the instruction. On appeal, the evidence is viewed in the light most favorable to the party requesting the instruction. See *McCullough*, 293 Kan. at 977.

*Analysis*

Unintentional second-degree murder is a murder committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 21-3402(b). At the time of Lorenza's killing, K.S.A. 21-3201(c) defined reckless conduct as "conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." "[A]n unintentional but reckless second-degree murder . . . is a killing of a human that is not purposeful, willful, or knowing but which results from an act performed with knowledge the victim is in imminent danger, although death is not foreseen." *State v. Deal*, 293 Kan. 872, 884, 269 P.3d 1282 (2012) (citing *Tahah*, 293 Kan. at 272).

Maestas compares his case to three prior Kansas decisions: *State v. Cordray*, 277 Kan. 43, 82 P.3d 503 (2004); *State v. Jones*, 27 Kan. App. 2d 910, 8 P.3d 1282 (2000); and *State v. Robinson*, 261 Kan. 865, 934 P.2d 38 (1997). In each, the evidence was held sufficient to support a reckless second degree-murder conviction. In *Cordray*, the evidence tended to show the defendant fired "warning shots" into the darkness at a vehicle he knew was occupied, but he did not intend to hit the vehicle's occupants. 277 Kan. at 56. In *Robinson*, the evidence tended to show the defendant "blindly" swung a golf club at a person with great force, intending to hit but

not kill him. 261 Kan. at 881. And in *Jones,* there was evidence the defendant fired a gun over a crowd randomly and with his eyes closed. 27 Kan. App. 2d at 915.

But Maestas' case is distinguishable. The evidence was that Maestas saw his mother asleep in her bed before he entered her room and stabbed her approximately 150 times in the head, neck, and chest, even as she pleaded with him to stop. There is no evidence that Maestas did not intend the attack to result in Lorenza's death. See *McCullough,* 293 Kan. at 979-80 (no error refusing to instruct on reckless second-degree murder because no evidence supported a claim that defendant did not intend the victim to die when she left scene of the crime after initial altercation, returned with a knife, and stabbed the victim in the abdomen). Nor, contrary to Maestas' arguments, is there evidence that he was thrusting his knife into a dark room without regard for any resulting danger.

We hold the district court did not err in refusing to instruct the jury on reckless second-degree murder.

## EVIDENCE OF ALLEGED MENTAL DEFECT

Maestas next argues the district court abridged his right to present his defense when it limited his ability to develop testimony at trial about his auditory hallucinations prior to the killing. This evidence was relevant, he contends, as part of his effort to convince the jury he did not intend to kill his mother and he thought he was confronting the voices he was hearing, rather than stabbing Lorenza. The State counters that Maestas failed to comply with the notice requirements in K.S.A. 22-3219(1), which provides:

"Evidence of mental disease or defect excluding criminal responsibility is not admissible upon a trial *unless the defendant serves upon the prosecuting attorney and files with the court a written notice of such defendant's intention to assert the defense that the defendant, as a result of mental disease or defect lacked the mental state required as an element of the offense charged.*" (Emphasis added.)

### Standard of Review

A claim that a defendant was denied the constitutional right to present a defense raises a question of law subject to de novo appellate review. *State v. White,* 279 Kan. 326, 331-32, 109 P.3d 1199 (2005).

*Analysis*

A defendant is entitled to present his or her theory of defense. The exclusion of evidence that is an integral part of that theory violates a defendant's fundamental right to a fair trial. But that right is subject to statutory rules and caselaw interpreting the rules of evidence and procedure. *State v. Wells*, 289 Kan. 1219, 1235, 221 P.3d 561 (2009).

Maestas concedes his purpose for eliciting testimony about his auditory hallucinations was to prove he did not intend to kill his mother. And there is no dispute Maestas failed to provide the notice required by K.S.A. 22-3219(1). Maestas argues only that K.S.A. 22-3219 did not bar evidence of his auditory hallucinations because it was being offered for purposes other than to prove he was incapable of forming the requisite intent. Therefore, we must decide whether that purpose properly falls within the statute's constraints for notice to the court and counsel. If so, the district court properly excluded it due to Maestas' failure to comply with the statute.

Maestas was charged with and convicted of first-degree murder as defined in K.S.A. 21-3401(a). That statute provides that first-degree murder is "the killing of a human being committed . . . intentionally, and with premeditation." K.S.A. 21-3401(a). Intent and premeditation are necessary elements of that offense. See *State v. Wimbley*, 271 Kan. 843, 847-48, 26 P.3d 657 (2001) (sufficient evidence to support premeditated first-degree murder conviction requires proof of intent to kill victim and premeditation); see also K.S.A. 21-3201(a) (criminal intent, established by proof of intentional conduct, essential element of every crime under Kansas Criminal Code unless statute otherwise specifies); *State v Phillips*, 295 Kan. 929, 937, 287 P.3d 245 (2012) (noting intentional second-degree murder differs from intentional first-degree murder by lacking element of premeditation); *State v. Cravatt*, 267 Kan. 314, 328, 979 P.2d 679 (1999) (premeditation is state of mind relating to reasons and motives for accused's acts and is necessary element of premeditated first-degree murder).

Maestas attempts to distinguish his proposed use of the auditory hallucination evidence from the use regulated by K.S.A. 22-3219(1)

by claiming he was not trying to establish that he was *incapable* of forming the requisite intent. But the statute's scope is not limited to evidence of inability to form intent. It applies whenever a defendant seeks to prove lack of the required mental state as a result of a mental disease or defect. See K.S.A. 22-3219(1); K.S.A. 22-3220. And since Maestas concedes his purpose was to negate the mental state elements of intent and premeditation, we hold that this evidence fell within the statute's scope.

Moreover, to the extent Maestas articulated a use of the auditory hallucination evidence that did not squarely fall within K.S.A. 22-3219(1), it was inadmissible. See K.S.A. 22-3220 ("Mental disease or defect [other than one resulting in lack of required mental state], is not otherwise a defense."); see also *Pennington*, 281 Kan. at 438 (upholding exclusion of mental disease or defect evidence when defendant did not proffer the evidence as tending to prove the disease or defect prevented him from forming required mental state). To present evidence of the auditory hallucinations at trial, Maestas was required to provide the notice set out in K.S.A. 22-3219(1). He did not, and the district court did not err in barring this evidence on that basis.

Finally, we note the exclusion of evidence is not necessarily error when the defendant nevertheless presented other evidence supporting the theory at issue that would have been sufficient for a jury to reach a conclusion as to that theory's validity. See *Wells*, 289 Kan. at 1235. In this case, the record shows that despite the order in limine Maestas and the State both presented testimony about Maestas' auditory hallucinations within the 2 months preceding the killing. We fail to see how the district court erroneously abridged Maestas' right to present his defense by preventing testimony prior to that time frame, and Maestas fails to articulate any such basis.

### FAILURE TO FIND MENTAL RETARDATION

At the time of Lorenza's killing, K.S.A. 21-4634 precluded the district court from imposing any mandatory prison term for premeditated first-degree murder upon a "mentally retarded" defendant as defined by the statute. Following Maestas' conviction,

he asked the district court to find him mentally retarded to invoke that statute's protections.

K.S.A. 21-4634 creates a two-step process for a district court to consider a convicted defendant's claim of mental retardation. First, the court must decide whether there is "sufficient reason to believe" the defendant is mentally retarded. K.S.A. 21-4634(a). Second, if the district court so finds, it must order psychiatric or psychological examinations of the defendant and convene an evidentiary hearing. K.S.A. 21-4634(a) and (b). If at the conclusion of that hearing the court determines the defendant is not mentally retarded, the defendant is sentenced as provided by law. K.S.A. 21-4634(c). If the court determines the defendant is mentally retarded, the defendant is sentenced as provided by law, except no mandatory term of imprisonment may be imposed. K.S.A. 21-4634(d).

To make the required findings, the district court must apply the statutory meaning given to the term "mentally retarded," which actually draws from two different sources. K.S.A. 21-4634(f) defines "mental retardation" to mean "having significantly subaverage general intellectual functioning, as defined by K.S.A. 76-12b01 and amendments thereto, to an extent which substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law." And K.S.A. 76-12b01(i) defines "significantly subaverage general intellectual functioning" as "performance which is two or more standard deviations from the mean score on a standardized intelligence test specified by the [S]ecretary [of the Department of Children and Families]."

In Maestas' case, the district court found there was sufficient reason to believe Maestas was mentally retarded. It then ordered the examinations and scheduled an evidentiary hearing. After that hearing, the district court found Maestas was not mentally retarded based upon the testimony and evidence. It sentenced Maestas to a hard 25 prison term. Maestas claims the district court erred by not applying the statutory definitions and giving insufficient weight to his most recent IQ test.

*Standard of Review*

The parties disagree over the applicable standard of review. Maestas contends the issue is a question of law subject to unlimited review because statutory interpretation is involved regarding the requirements of K.S.A. 21-4634 and K.S.A. 76-12b01. The State acknowledges statutory interpretation is required but cautions that an appellate court must not reweigh the evidence adduced at the hearing. The applicable standard of review for the district court's conclusions following the evaluation and hearing in the second step of a K.S.A. 21-4634 proceeding is a question of first impression for this court, but we have other caselaw to guide the analysis.

In *State v. Backus*, 295 Kan. 1003, 1015, 287 P.3d 894 (2012), the court held that the preliminary finding that there is "reason to believe" the defendant is mentally retarded under K.S.A. 21-4634(a) should be reviewed for an abuse of discretion. In so ruling, the *Backus* court relied in part on *State v. Lopez*, 271 Kan. 119, 127, 22 P.3d 1040 (2001), which applied an abuse of discretion review to the preliminary reason-to-believe finding when a district court considers whether a defendant is competent to stand trial. *Backus* analogized the initial determination under K.S.A. 21-4634(a) to an adjudication of competence to stand trial under K.S.A. 22-3302. It held that the same standard of review should apply to both of these initial determinations. *Backus*, 295 Kan. at 1015.

Following that same logic, we note the second-step determination under K.S.A. 21-4634 is quite similar to the evaluative process a district court is required to apply when deciding whether a defendant is competent to stand trial. For example, a district court determines competency after a hearing during which evidence may be heard regarding psychiatric or psychological examinations. See K.S.A. 22-3302(a)(3). And, just as with K.S.A. 21-4634, the defendant in a competency proceeding is required to be personally present. Also, under K.S.A. 22-3301 a person is incompetent to stand trial when the defendant is unable to understand the nature and purpose of the proceedings or to make or assist in making the defendant's defense because of mental illness or defect. Under

K.S.A. 21-4634, a district court applies the statutory definition of "mentally retarded" to decide if the convicted defendant's intellectual disability substantially impairs his or her capacity "to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law."

This court has long applied an abuse of discretion standard when reviewing a district court's decision that a defendant is competent to stand trial. See, *e.g.*, *State v. Hill*, 290 Kan. 339, 366-67, 228 P.3d 1027 (2010). Extending our reasoning in *Backus*, we hold that an abuse of discretion standard governs review of a district court's ultimate decision whether a defendant is mentally retarded under K.S.A. 21-4634. The statutory structure, evaluation process, and ultimate determinations by the district court are comparable to proceedings under K.S.A. 22-3302. It is reasonable for these two similar statutory processes to share the same appellate review standard.

Our abuse of discretion standard is well known. Judicial discretion is abused if judicial action is: (1) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *McCullough*, 293 Kan. at 980-81.

*Analysis*

In Maestas' case, the parties focus on whether the district court properly applied the statute and whether there was substantial competent evidence to support the district court's decision. Maestas argues the district court did not apply the definition of mental retardation found in K.S.A. 21-4634(f) because Maestas' most recent IQ test—the one Goodman administered—established he was mildly to moderately mentally retarded. The State points out the experts evaluating Maestas' intellectual functioning disagreed in substantive ways about both the testing and the conclusions to be reached from it.

Goodman administered a postconviction IQ test to Maestas and concluded he was "definitely functioning in the mentally retarded range." He testified a subject is "mentally retarded" at IQ scores of 70 and below. Goodman said Maestas scored 45 on the IQ test. But Goodman also estimated that Maestas' score would have been at least 15 points higher—in the mid-60s—if Maestas had not been hearing voices during the evaluation. Goodman also admitted he could not explain why he predicted only a 15-point increase: "[T]o say it's 15 to 20 points or 40, [there] is no real way I can say that. I can only base it on my experiences with all the times I give them the tests. No scientific way to do that."

Shannon testified that Maestas was uncooperative during their first meeting, which prevented a mental status evaluation. In his written report, Shannon indicated he relied substantially on previous hospitalizations and past evaluations for his conclusions because Maestas had "presented a number of elements that have seriously compromised the evaluation process during this admission." In particular, Shannon noted Maestas' behavior was consistent with a person attempting to exaggerate mental retardation and mental illness symptoms. He also described how four separate attempts to interview Maestas had ended after Maestas refused to give verbal responses, refused to acknowledge listening to Shannon, or refused to answer questions. He also noted Maestas refused medication. Shannon said he formed his opinion about Maestas' IQ based on reports from Maestas' previous 2007 and 2009 commitments at Larned. He concluded Maestas possessed an IQ in the 80-90 range in 2007.

Shannon, like Goodman, agreed that a subject is mentally retarded at IQs of 70 or below. But Shannon concluded Maestas did not meet the criteria to be considered mentally retarded because intelligence is "fairly stable" over a lifetime, so he believed Maestas' intelligence would have remained in the same range from birth. He also discounted Goodman's evaluation because Maestas was experiencing psychological symptoms at the time, which would interfere with the test-taker's ability to respond. Shannon concluded this distorted response would likely be reflected "as a considerably lower than accurate score due to the psychosis, not to the intellec-

tual capacity of the individual." Shannon, however, admitted there was no way to tell precisely how flawed Goodman's test was or how much the psychosis influenced the score. In his written report, Shannon ultimately concluded:

"Based upon the sources of information reviewed in the performance of this evaluation, as discussed in this report, it is the opinion of this evaluator that Mr. Maestas' intellectual functioning, as measured by IQ is higher than the prescribed score of 70 required to meet the criteria to be considered an individual with Mental Retardation, as defined by both the DSM-IV, TR and K.S.A. 76-12b01(d)."

Under K.S.A. 21-4634(f), evidence that a defendant's IQ is greater than 70 is sufficient to support a finding that the defendant does not possess significantly subaverage general intellectual functioning. See K.S.A. 76-12b01(i) (defining significantly subaverage general intellectual functioning as scoring two standard deviations from the mean on standardized IQ test); see also *Penry v. Lynaugh*, 492 U.S. 302, 308 n.1, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (reciting definition of mental retardation, including "significantly subaverage general intellectual functioning" and stating "[t]o be classified as mentally retarded, a person generally must have an IQ or 70 or below."), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

Obviously, the expert evaluations were in dispute. Shannon testified Maestas possesses an IQ higher than that at which a person is considered to have subaverage general intellectual functioning under the statute. He also offered criticism as to the reliability of Goodman's contrary testimony.

We identify no abuse of discretion in the district court's determination that Maestas was not mentally retarded. The ruling is fully supported by Shannon's testimony that Maestas was not mentally retarded as defined by the statute. The district court did not err when it resolved the conflicting expert testimony against Maestas.

## COMMITMENT TO STATE SECURITY HOSPITAL INSTEAD OF PRISON

K.S.A. 22-3430(a) authorizes a district court to commit a defendant convicted of a felony to the state security hospital or any state or county institution provided for the reception, care, treat-

ment, and maintenance of mentally ill persons. This authority is triggered when an examination ordered by the court under K.S.A. 22-3429 shows: (1) The defendant is in need of psychiatric care and treatment; (2) the treatment may materially aid in the defendant's rehabilitation; and (3) the defendant and society are not likely to be endangered by permitting the defendant to receive such psychiatric care and treatment in lieu of confinement or imprisonment. K.S.A. 22-3430(a). Maestas argues the district court erred in denying his request for a commitment to Larned in lieu of prison.

### Standard of Review

A defendant whom the district court commits to the state security hospital may appeal that commitment "in the same manner and with like effect as if sentence to a jail, or to the custody of the secretary of corrections had been imposed." K.S.A. 22-3430(c). But the statute is silent as to whether an appeal may be taken from a denial of a request for commitment. We must consider first what, if anything, to read into this statutory silence about our jurisdiction to consider this issue. An appellate court has a duty to question jurisdiction. *State v. Comprehensive Health of Planned Parenthood*, 291 Kan. 322, 352, 241 P.3d 45 (2010).

In *State v. Adkins*, 236 Kan. 259, 261, 689 P.2d 880 (1984), the court held that a district court's refusal to commit a defendant under K.S.A. 22-3430 "is wholly a matter of trial court discretion *and is not reviewable on appeal.*" (Emphasis added.) In so ruling, the *Adkins* court observed that the statute grants no right to commitment in lieu of prison and is simply a conditional grant of authority to the district court in sentencing when the statutory prerequisites exist. 236 Kan. at 261. In 1994, this court followed *Adkins* by again holding that "[t]he refusal of a trial judge to commit a defendant to a state mental institution in lieu of imprisonment *is . . . not reviewable on appeal.*" (Emphasis added.) *State v. Baker*, 255 Kan. 680, 693, 877 P.2d 946 (1994), *abrogated on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). Neither case explains why this discretionary decision is not review-

able on appeal, unlike other routinely reviewed discretionary decisions.

Maestas argues an abuse of discretion standard should apply because the statute's plain language connotes the element of discretion in the court's decision once the statutory criteria are established. He concedes this requires us to abrogate *Adkins* and *Baker*. The State responds simply by urging us to adhere to past precedent.

Maestas makes a legitimate point. The statute plainly states that satisfaction of the statutory conditions, *i.e.*, a report noting satisfaction of the three criteria spelled out, confers upon the district court discretionary authority to commit a defendant to the state security hospital. The statute places no other limitations on this authority. See K.S.A. 22-3430(a).

Appellate courts routinely review district court decisions that are discretionary in character. See, *e.g.*, *Backus*, 295 Kan. at 1015 (preliminary "reason to believe" finding under K.S.A. 21-4634[a] should be reviewed for abuse of discretion); *Phillips*, 295 Kan. at 947-49 (reviewing district court's discretionary admission of evidence defendant fled from police); *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011) (reviewing district court's discretionary decision to not declare mistrial); *State v. Spotts*, 288 Kan. 650, 654-57, 206 P.3d 510 (reviewing district court's discretionary determination whether proffered reasons for durational sentencing departure were substantial and compelling); *Mitchell v. City of Wichita*, 270 Kan. 56, 66-67, 12 P.3d 402 (2000) (discretionary decisions to grant or deny new trial and to grant or deny motion to alter or amend judgment reviewed for abuse of discretion).

K.S.A. 22-3430 gives no express indication that an appellate court should not review the decisions made under its provisions, so the failure of the *Adkins* and *Baker* courts to explain their holdings that decisions under K.S.A. 22-3430 are not reviewable on appeal is puzzling. Compare K.S.A. 22-3430 with K.S.A. 2012 Supp. 21-6820(c) (specifically prohibiting review of certain criminal sentences). The doctrine of stare decisis holds:

"[O]nce a point of law has been established by a court, it will generally be followed by the same court and all courts of lower rank in subsequent cases when the same

legal issue is raised. A court of last resort will follow that rule of law unless clearly convinced it was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent." *Miller v. Johnson*, 295 Kan. 636, 653, 289 P.3d 1098 (2012) (citing *Rhoten v. Dickson*, 290 Kan. 92, 112, 223 P.3d 786 [2010]).

In reviewing K.S.A. 22-3430, we discern no reason why a district court's decision to commit—or not commit—a defendant to Larned in lieu of prison should avoid appellate scrutiny. *Adkins* and *Baker* cannot be reconciled with the common practice by appellate courts of reviewing other discretionary district court decisions. In addition, we perceive no basis for considering K.S.A. 22-3430(c), which expressly provides that an order of confinement in lieu of imprisonment is appealable, an implicit jurisdictional bar to appellate review only to those situations in which a district court actually orders confinement. We read K.S.A. 22-3430(c) to simply clarify that a convicted defendant who is confined to a state security hospital in lieu of prison has the same rights to appeal as those who are convicted and sent to prison.

We hold that a district court's decision to refuse psychiatric commitment in lieu of prison pursuant to K.S.A. 22-3430 is reviewable on appeal for an abuse of discretion. In light of that holding, we proceed to employ that standard in considering the merits of Maestas' arguments.

*Analysis*

When Maestas filed his motion for confinement at Larned in lieu of prison, the district court ordered a mental examination under K.S.A. 22-3429. Shannon prepared that report. He diagnosed Maestas with schizoaffective disorder, depressive type; antisocial personality disorder; and alcohol and chemical substance abuse. In a section entitled "opinion," Shannon wrote: "The question at hand concerns Mr. Maestas' level of intellectual functioning, specifically, does he meet the criteria of K.S.A. 76-12b01(d) [for mental retardation]." Shannon then drew a conclusion about Maestas' level of intellectual functioning.

At Maestas' sentencing hearing, Shannon agreed with Maestas' attorney that Maestas was mentally ill and needed treatment. When

asked what type of treatment Maestas needed, Shannon replied that previous examinations showed medication stabilized him and resolved psychotic symptoms. He further acknowledged that Larned could "take care of this treatment" and that Maestas would benefit from taking medication.

As to this report, we must pause to note our concern because it is questionable whether Shannon's report addressed the three prerequisites set out in K.S.A. 22-3430(a)—even if combined with his testimony at the sentencing hearing. There appear to be at least three shortcomings. First, the report and testimony did not fully address whether Maestas was in need of "psychiatric care and treatment." Shannon testified Maestas was in need of medication to manage the symptoms of psychiatric disorders but did not elaborate. Second, there was no information in the report or testimony directed toward whether treatment would materially aid in Maestas' rehabilitation. Third, the report and testimony lacked any information concerning the likelihood of danger, if any, to Maestas and society that would follow from confining him to Larned.

Such failures prevent the statute from operating as intended, which is to provide specific information to aid the district court's determination. A report that addresses—one way or the other—the three statutory requirements is important because the statute expressly states what the report must contain *before* a district court has authority to place a convicted defendant in the state security hospital or some other suitable institution. See K.S.A. 22-3430(a).

But Maestas did not argue the report was deficient before the district court, nor did he object to its admission into evidence at the sentencing hearing. On appeal, he does not argue the report failed to comply with the court's order, and we are not asked to consider what issues, if any, may arise from an incomplete report. See *State v. Dennis*, 297 Kan. 229, 240, 300 P.3d 81 (2013) ("Issues not briefed on appeal are deemed waived."). Therefore, we address only the issue as presented by Maestas on appeal.

Maestas contends the district court erred in sentencing him to prison because the evidence presented collectively by both Goodman and Shannon satisfied the three requirements of K.S.A. 22-3430(a) and justified placement at Larned. This argument is with-

out merit. A report satisfying the statute's three prerequisites for authority to order psychiatric commitment in lieu of imprisonment merely confers upon the district court that authority; it does not require the district court to issue such an order. Whether the district court exercises this authority remains a matter of judicial discretion. See K.S.A. 22-3430(a).

At the sentencing hearing, the district court indicated in denying Maestas' request for placement at Larned that it had reviewed the information provided and the expert testimony. It concluded Maestas should be in the custody of the Department of Corrections and said it "ha[d] faith" the department would take "appropriate action" in terms of placement for Maestas while he was in custody. In addition, we do not consider Goodman's testimony relevant when deciding whether the statutory criteria were met to confer discretion on the district court because the district court ordered Larned to prepare the report for this statutory purpose, not Goodman. See K.S.A. 22-3429 (trial judge may order the defendant committed for mental examination, evaluation, and report). Based on the district court's order for evaluation, review of the decision to send Maestas to prison under K.S.A. 22-3430 must be viewed based on the contents of the report prepared by Shannon and as supplemented by his testimony.

Assuming the court had discretion based on a statutorily compliant report and testimony from Shannon, the district court did not abuse that discretion.

Affirmed.