NOT DESIGNATED FOR PUBLICATION

No. 118,053

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CARL M. BURRIS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Clay District Court; JOHN F. BOSCH, judge. Opinion filed May 11, 2018. Affirmed in part, vacated in part, and remanded with directions.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Richard E. James*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., PIERRON and STANDRIDGE, JJ.

PER CURIAM: Carl M. Burris was convicted of aiding and abetting possession with intent to distribute a controlled substance. He appeals and alleges the State committed prosecutorial error. He also appeals the district court's assessment of Board of Indigents' Defense Services (BIDS) fees without considering his financial resources.

On August 24, 2016, Ronnie Gosson called the Clay County Sheriff's Department to report that Carl M. Burris and Katie Herrera were on their way to Clay Center with drugs in a truck. Gosson told Deputy Jeff Browne there were syringes under the passenger seat of the truck and drugs in Herrera's purse. Browne believed they were

1

going to town to sell the drugs. Browne had previous knowledge of Herrera's involvement with drugs. Browne drove to the county line to intercept the truck. When he did not see the truck, he returned to Clay Center and drove by Burris' residence. Dispatch advised him of a second call alleging that Herrera was attempting to sell methamphetamines in the courthouse square. As Brown passed the residence, Samantha Burris, Burris' wife, saw him. He motioned to her and she followed him.

Deputy Browne saw Burris' truck on the north side of the courthouse square. Browne approached Burris, who was sitting in his truck, and informed him of the reports that there were drugs in the truck. Burris said he was at the courthouse for Herrera to obtain a protection from abuse order against her husband. When Browne asked if he could search the truck, Burris stated that he did not believe there was anything under the seat. At that point, Samantha reached the passenger door and listened through the open window. Browne repeated his request and Burris stated that he wanted to check first. As Burris walked to the passenger side of the vehicle, Samantha opened the door and looked under the passenger seat. Browne testified he could see Samantha's hands before she opened the door and knew she did not have anything in her hands when she looked in the truck. Samantha stepped away from the truck and told Burris not to let Browne search. She testified that she could not see anything, but she had felt a baggie when she put her hand under the seat. Burris then looked under the seat and revoked his consent for Browne to search the truck.

Undersheriff Jim Bogart, the Clay County Sheriff's Department canine handler, arrived and walked the canine around Burris' truck. After the canine indicated there were drugs in the vehicle, Deputy Browne searched the truck. Under the passenger seat, he found a clear zipper baggie with three syringes loaded with a clear liquid and one empty syringe. Browne testified that based on his training and experience, loaded syringes are packaged for sale and it is not an efficient way to carry drugs because the syringe plunger could easily be depressed, wasting the substance.

2

Deputy Browne subsequently arrested Burris for possession of methamphetamines with intent to distribute. Small amounts of the liquid from each syringe were sent to the Kansas Bureau of Investigation (KBI) for testing. KBI forensic scientist Beth Royel testified that methamphetamines were detected in each of the samples.

Deputy Browne interviewed Gosson who stated Samantha had called him Tuesday night while she, Burris, and Herrera cleaned out the Burris' house in Clay Center. Samantha told Gosson that Katie had placed the syringes under the passenger seat of the truck. Samantha later saw the syringes as she loaded items into the truck. Gosson believed that Burris and Herrera were returning to Miltonvale on Tuesday evening so he called the Cloud County Sheriff's Department to report methamphetamines were in the vehicle.

Samantha called Gosson on Wednesday to let him know she was meeting Burris and Herrera before driving back to Clay Center. Though she did not mention the drugs, Gosson called the Clay County Sheriff's Department based on his assumption that the syringes were still in the truck. Gosson told Deputy Browne that Herrera has "been doing this forever." He did not believe that Samantha wanted to get Herrera or Burris in trouble, but she just wanted to put an end to the drug involvement. Gosson decided to call law enforcement because he was "pissed" that Herrera has been "doing this shit forever" and he blamed her for Samantha and Burris separating after 30 years of marriage. He did not believe that Samantha planted the syringes and told Browne that he had arrested the right people.

During trial, Gosson testified that Burris did not use drugs. He blamed Herrera, alleging she did not "want to go down by herself, she want[ed] to take other people down with her." Despite having told Browne that he had arrested the right people, Gosson believed that only Herrera should have been arrested because she had placed the

3

methamphetamines in the truck. He further testified that both Samantha and her friend, Rhonda, had called him on the night of August 23, 2016, claiming Herrera told them she had planted the syringes under the passenger seat while Burris was asleep. Samantha later contradicted Gosson's testimony by claiming that she could not have called Gosson on the 23rd because she did not have access to a phone.

In the course of the investigation, Burris provided multiple theories as to how the methamphetamines got into his truck. Initially, he blamed Samantha for planting the syringes. However, his theory changed with each call to Deputy Browne. Browne followed up on each theory but found no evidence to support any of them. Samantha acknowledged that Burris blamed her, but she denied the allegations. She testified that despite Burris having an affair with Herrera, she had no ill will toward them. Although she and Burris had separated, they maintained a good relationship and spent time together regularly as they co-parented their young son.

Gosson and Samantha both testified that Burris did not use or sell drugs. However, Samantha testified that she was aware of Burris previously testifying he drove Herrera to Riley County to purchase drugs. She explained that she and Burris had previously worked as confidential informants for law enforcement. She testified they had been involved with law enforcement in Clay County, Riley County, and Cloud County. However, they had not been involved in any cases that had gone to court. She also reported that she and Burris had worked for an FBI agent in Arkansas.

Burris testified that when he took Herrera to Riley County to purchase drugs, he did so to help law enforcement catch the person who was going to sell her pills. Although they never made contact with the seller, Burris provided the location information to Officer Melvin with the Riley County Police Department. He further stated that even though law enforcement was not always involved in his transactions, his primary objective was to gather information to pass on to law enforcement.

4

In closing argument, the State addressed the inconsistency from Gosson's recorded interview to his testimony. Acknowledging Burris' claim of working as an informant, the State also encouraged the jurors to use their knowledge of police techniques in determining whether a law enforcement agency would condone individuals engaging in buying or selling narcotics without police supervision. The State encouraged the jury to remember the uncontroverted facts of the case: Browne found Burris in his truck at the courthouse square with three syringes loaded with methamphetamines under the passenger seat.

Burris stated multiple times in closing argument that everything goes back to Samantha. He urged the jurors to consider the specificity with which she provided information to Gosson. Burris reminded the jury that to find him guilty, it was required to determine he had knowledge that the syringes were in his truck and he had the intent to control them. In addressing the allegation that he and Herrera took methamphetamines to the courthouse square to sell, Burris stated:

> "Now, you have to ask yourself, and I think I'm going to offend some of the lady here, who have big ball to bring drugs to the courthouse which is less than – just around the corner from the law enforcement building and sell drugs right here at the courthouse?
> "You've got to be pretty stupid to do that. The police is right around the corner, bring drugs to courthouse and approach somebody in courthouse square to sell drugs?
> "Who will do that?"

Burris further echoed the statements by Gosson and Samantha that he did not use or sell drugs, noting that his involvement with drug deals was to gather information for law enforcement.

In rebuttal, the State partially agreed with Burris' statement about selling drugs at the courthouse square:

"[Y]ou've got to be pretty stupid to sell on the courthouse square, or try, but if you read the [Clay County] Dispatch, you know people have been arrested in this courthouse with drugs, inside the courthouse.

"Pretty stupid?

"Absolutely.

"Do people who sell and use drugs do stupid stuff?

"I would say by definition. I would say by definition, they do."

The jury found Burris guilty of aiding and abetting possession of a controlled substance with intent to distribute. Burris polled the jury and all members agreed with the verdict.

On June 22, 2017, the district court sentenced Burris to 15 months' imprisonment with the Kansas Department of Corrections with 24 months of postrelease supervision. Although his criminal history score was I and his offense fell in a border box on the grid, the district court stated that border boxes are presumptive prison and Burris provided no reason under the statute to grant the optional nonprison sentence, such as the need for a treatment program or reformation. When the court assessed fees and costs, it did not assess the correctional supervision fee, but then assessed the BIDS attorney fees of $2,800. Burris timely appealed.

We first must determine whether the State committed prosecutorial error by encouraging the jury to consider facts not in evidence.

Under the modified *Sherman* standard, the appellate court uses a two-step process to evaluate claims of prosecutorial error:

"These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide

6

whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied*, 565 U.S. 1221 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

*Sherman* did not change the assessment of the first-prong; it is clearly improper for a prosecutor to state facts that are not in evidence. *State v. Banks*, 306 Kan. 854, 862, 397 P.3d 1195 (2017). However, even if the prosecutor's actions were egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmless test. *Sherman*, 305 Kan. at 114.

Burris contends the State committed prosecutorial error by telling the jury "if you read the Dispatch, you know people have been arrested in this courthouse with drugs, inside the courthouse." The Clay Center Dispatch is the local newspaper. The State had not submitted any evidence of drugs sales in the courthouse and no editions of the newspaper had been admitted into evidence. Burris cites to *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011), in which the court emphasized that prosecutors may draw reasonable inferences from evidence but may not comment on facts outside the evidence.

During closing argument, prosecutors must restrict their comments to matters in evidence. *State v. Fisher*, 304 Kan. 242, 252, 373 P.3d 781 (2016). Any argument "must accurately reflect the evidence, accurately state the law, and cannot be 'intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.'" *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012) (quoting *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 [2004]). Even if the prosecutor's statement was extemporaneous rebuttal to the defense's argument, it may be prejudicial. *State v. Roeder*, 300 Kan. 901, 934, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015) (disavowing language in previous cases that defense provocation can justify prosecutorial misconduct).

The State admits that the contested statement was ill advised but contends it was a reasonable inference from the evidence at trial based on Browne's testimony about the tips received and Burris' closing argument about the stupidity of selling drugs at the courthouse square. The State was attempting to convey that people possess or sell drugs anywhere.

The State compares the contested statement to those in *State v. Peppers*, 294 Kan. 377, 276 P.3d 148 (2012). In *Peppers*, the witness and defendant had been incarcerated together in Colorado. To show that he had received the information about the crime from the defendant, the witness testified that he had very little connection with the state of Kansas, he had not viewed or read news from Kansas, and people he knew from Kansas never spoke of a Topeka crime. In closing, the prosecutor expressed that the information in the witness' testimony was not public knowledge, stating, "If it was in the Topeka Capital-Journal in '07, we would have seen a copy of it." 294 Kan. at 395. The Kansas Supreme Court held that, taken in context, the statement about the newspaper as the prosecutor's explanation of the witness' "logical source" of information included reasonable inferences based on the evidence in trial. 294 Kan. at 395.

8

In *Peppers*, the statement about the Topeka Capital-Journal was a reasonable inference because the source of the witness' information was contested during the trial and the witness specifically testified about not having obtained the information from a newspaper. The prosecutor used the newspaper reference to show that the information presented was not public knowledge. Unlike *Peppers*, the State's comment here was made to show that people had been arrested for possessing drugs inside the courthouse. However, no evidence about arrests inside the courthouse had been presented in trial. The State contends the statement was justified as a reasonable inference because of Browne's testimony and Burris' closing argument. However, provocation by the defense is not an excuse for prosecutorial error. Browne's testimony provided that Burris and Herrera went to the courthouse square to sell methamphetamines, which does not provide a reasonable inference that others have been arrested inside the courthouse in possession of drugs. The State's rebuttal presented facts not in evidence and was improper.

When the appellate court determines that an error such as this has occurred, the State must prove beyond a reasonable doubt that the error did not influence the verdict. *State v. Kahler*, 307 Kan. 374, 382, 410 P.3d 105 (2018). The *Sherman* court noted that while different courts articulate harmlessness differently, all aim to determine whether the defendant's due process rights to a fair trial were prejudiced. 305 Kan. 109. In determining whether the State has shown that there is no reasonable possibility that the error contributed to the verdict, we must consider all indicators of prejudice, as argued by the parties. 305 Kan. at 111. With the focus on whether the error affected the verdict, the strength of the evidence against Burris is secondary to the analysis of whether the statement affected the verdict. 305 Kan. at 111.

Burris asserts the State's comment was highly prejudicial because a cornerstone of his defense was that he would not have been so bold as to sell drugs in the courthouse square, which is "around the corner from the law enforcement building." Alleging that Samantha had framed him, Burris claimed ignorance of the methamphetamines in his

9

truck. At trial, Burris addressed the questionable report of Herrera attempting to sell drugs, noting that Sherry Reed (the second caller) may not actually exist; that Herrera did not have any drugs in her possession when she was arrested; and Samantha knew exactly where the methamphetamines were hidden.

The State acknowledges that even though the fact that it made the improper remarks as extemporaneous rebuttal does not justify the statements, we may consider that as a factor. *State v. Marshall*, 294 Kan. 850, 861, 281 P.3d 1112 (2012). The State further claims its statement was not prejudicial because: (1) the second jury instruction advised jurors to disregard any statements by counsel that were not supported by evidence; (2) most of its closing argument was spent on reviewing the law, evidence, and the jury's responsibilities; and (3) even without the improper statement, the evidence was sufficient for a guilty verdict.

The State has failed to provide any legal basis for its assertion that jury instructions absolve improper comments of prejudice. When a litigant has not adequately briefed an issue, it is deemed abandoned. *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014). "Simply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority, is akin to failing to brief an issue." *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 (2002). However, while the jury instruction does not excuse an improper statement, we may consider that as a factor in our determination. See *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015). Further, at all times, prosecutors have the "'responsibility of a minister of justice and not simply that of an advocate.'" *State v. Maestas*, 298 Kan. 765, 777, 316 P.3d 724 (2014); see KRPC 3.8 cmt. 1 (2018 Kan. S. Ct. R. 353) (Special Responsibilities of a Prosecutor). As a minister of justice, ensuring the protection of the defendant's rights, the State cannot justify an improper statement by balancing it with the amount of proper statements made.

10

The State correctly contends that without the improper statement, there was sufficient evidence that the jury would have reached the same verdict. During closing arguments, Burris claimed it would require a lot of gall to take drugs to the courthouse square. However, throughout the trial, one of his theories was that Samantha planted the syringes under the passenger seat while Burris and Deputy Browne stood mere feet away. This defense required the jury to determine whether it was Burris or Samantha who had the gall to take the methamphetamines to the courthouse.

Furthermore, the statement about the Clay County Dispatch did not directly relate to any of the facts of the trial. We must view the statement in the context it was made. The statement was a general statement in rebuttal of Burris' assertion that somebody would have to be "pretty stupid" to take or attempt to sell methamphetamines at the courthouse, just around the corner from the law enforcement building. The State further used the same "pretty stupid" language to claim that criminals in general tend to make "stupid" choices. Though the statement rebutted Burris' contention that it is rare for somebody to be that stupid, it did not have any direct link to the jury determination of whether Samantha or Burris took the methamphetamines to the courthouse square.

Burris contends the State used the comment about the Clay County Dispatch to bolster the assertion that Herrera had attempted to sell methamphetamines at the courthouse or that such activity was not beyond belief. However, the suggestion of hypothetical news of previous arrests inside the courthouse would have had no bearing on the verdict. The fact that offenders had possessed or sold drugs in close proximity to law enforcement was no secret.

The evidence showed that Samantha went to the courthouse after Deputy Browne motioned her to follow as he passed by her house. Browne testified he drove past the Burris house, looking for Burris, before going to the courthouse square. Browne stated that before Samantha opened the passenger door, he could see her hands. His body cam

11

video supported his testimony. Further, it was uncontested that Browne found the syringes under the seat of Burris' truck. While Burris contended that Samantha had framed him, Browne testified that throughout his investigation Burris had called him multiple times with different theories of who had framed him and how. Further, Burris presented no support for his theory that he was framed. Therefore, the improper statement had no effect on the verdict and was not prejudicial to Burris.

We next address the issue of whether the district court erred by assessing BIDS attorney fees without considering Burris' financial resources.

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015).

Burris contends the district court erred by not considering his financial resources or ability to pay when assessing $2,800 in BIDS attorney fees. According to K.S.A 2017 Supp. 22-4513(b), "In determining the amount and method of payment of such sum, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose." The Kansas Supreme Court recognized that the language in the statute is mandatory, giving no indication that a defendant must first request the court to consider his or her financial circumstances when assessing BIDS fees. *State v. Robinson*, 281 Kan. 538, 543, 132 P.3d 934 (2006). The *Robinson* court determined that the district court must explicitly consider the defendant's financial resources and the nature of the burden such payment will impose, stating on the record how the court weighed those factors. 281 Kan. at 546.

The State concurs the district court failed to consider Burris' financial resources or the burden on him when assessing fees. As the court assessed fees at sentencing, Burris' attorney stated, "Your Honor, since he's going to DOC, I don't think we should assess . . . ." To which the district court replied, "That's right, the correctional supervision fee is not

12

to be [assessed], but the BIDS attorney fees will be assessed of $2,800." Both parties properly claim the court failed to consider the *Robinson* factors. Therefore, we vacate the BIDS fee and remand to the district court for consideration of Burris' financial resources and the nature of the burden of the BIDS fees.

Affirmed in part, vacated in part, and remanded with directions.