NOT DESIGNATED FOR PUBLICATION

No. 121,859

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JEREMIAH SCOTT MORK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed October 29, 2021. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., HILL and HURST, JJ.

PER CURIAM: Jeremiah Mork appeals his convictions for voluntary manslaughter and aggravated battery. He raises claims of trial court error by denying his motion for a mistrial, some instructional errors, as well as cumulative error. None are persuasive. We affirm his convictions.

*An eviction leads to a fatal shooting.*

While Mork was spending some time in jail, his girlfriend, Tiffany Brittain, allowed Randy Gibson to live in her house in exchange for handyman services. She complained that Gibson allowed people into the house who used and sold drugs. Gibson even injected Brittain with drugs. One of Gibson's friends made a sexual advance on Brittain by placing her hand on his crotch.

When Mork got out of jail, he decided to clean house. After Brittain told him about what had happened, he kicked Gibson out of the house. At the time, there was a confrontation between the two with yelling and name calling. As Gibson left, he told Mork he would bring some people back over to the house, including the man who had touched Brittain. Mork said he'd be "here waiting on the porch."

Later that day, Gibson sent threatening messages to Mork and Brittain. Mork offered to "get down in the driveway." Gibson said that he wanted to get his things from the house and they "can do this the easy way or the hard way." Because of the threats, Mork was worried about Brittain. Mork's father brought him a 9 millimeter handgun.

Gibson and his friend Carlos Triana borrowed a pickup truck from Dale Darnell to move Gibson's things out of the house. Darnell called Mork to see what Gibson and Triana were walking into—in other words, "how hot the situation was." Mork told Darnell they were "going to handle it how they handle it" or "handle it, you know, like men." Gibson and Triana picked up Ryan Scott on the way. Triana carried a .22 caliber revolver in a holster on his hip.

After midnight on December 9, 2017, Gibson, Triana, and Scott arrived at the house and parked in the driveway. Mork watched them from a surveillance camera and headed to the front door. Gibson told Mork that they were there to get his things. With

2

Mork's permission, the men went into the house and started packing up and moving out Gibson's things. One of the items Gibson retrieved was his rifle he had kept at the house. When the men carried out a mattress from Gibson's room, Brittain yelled at Gibson, saying it was her mattress. Brittain then went into the bedroom and shut the door.

While Triana and Scott were outside and headed toward the front door of the house, Mork shot Gibson several times. Scott saw Gibson fall to the floor and Mork continued to shoot Gibson. Mork then shot at Triana and Scott through the glass front door, shattering it. Triana and Scott ran in opposite directions. Scott was shot three times in his leg. Triana was hit in his upper thigh. Gibson was still on the floor, but not dead. Mork then continued to fire the gun at Gibson, stopping only to reload. In all, Mork fired 22 rounds from the pistol. He shot Gibson 15 times. Gibson died where he fell.

Except for one casing that was located outside on the porch, all the shell casings were found inside the house. No evidence showed that any shots were fired from outside of the house toward the inside of the house. But Triana's revolver would not have ejected any shell casings.

Mork later explained he thought that Gibson had a gun in his pocket and he shot him when Gibson started to pull it out of his pocket. Mork said he continued to shoot Gibson because Gibson continued reaching for the gun. It turns out that Gibson did not have a gun—he had a folded pocketknife in his pocket when he died. He brought a knife to a gun fight. Mork said one of the men was holding the rifle when he started shooting. He did not know whether the man put it down or carried it off. Police later found a rifle in the cab of the pickup truck.

Gibson had a reputation of being violent and a "thug." He was known "as an enforcer." He had two prior convictions for criminal threat. Gibson had high levels of methamphetamine in his system when he died.

3

Mork admitted shooting at Scott and Triana. But he thought he had only hit one of them. Scott thought he had been shot by two different weapons. Triana's wound was in a vertical path. A private investigator, Joseph Schillaci, thought Triana had shot himself in the leg when trying to draw his pistol. Triana turned over his gun to police.

*We add details about the trial.*

The State charged Mork with premediated first-degree murder, two counts of aggravated battery by inflicting great bodily harm, and criminal possession of a weapon by a felon. For the murder charge, the court instructed the jury on the lesser included offenses of second-degree intentional murder, voluntary manslaughter based on an unreasonable but honest belief that deadly force was justified, and involuntary manslaughter. On the aggravated battery charge against Triana, the court instructed the jury on the lesser included offense of aggravated battery in any manner whereby great bodily harm, disfigurement, or death can be inflicted. The court also gave self-defense and defense-of-another instructions.

Before trial, the court found Triana was unavailable as a witness and that his preliminary hearing testimony could be presented at trial. The court refused Mork's request to instruct the jury that Triana was unavailable as a witness to testify because he was "on the run."

Darnell testified that Mork "was in jail and he got out." Mork requested a mistrial. The court denied the request and told the jury to disregard that testimony.

The jury convicted Mork of voluntary manslaughter based on an unreasonable but honest belief that deadly force was justified and two counts of aggravated battery with a firearm. Mork pled guilty to criminal possession of a weapon by a felon. Using a criminal history score of B, the court sentenced Mork to 322 months in prison.

4

Mork raises several issues in this appeal:

1. It was error for the court to deny his motion for a mistrial when Darnell testified that he had been in jail;
2. the court should have told the jury why Triana was unavailable as a witness;
3. it was clear error when the court failed to instruct the jury on reckless aggravated battery;
4. it was clear error when the court failed to instruct the jury that his actions must have been the proximate cause of Triana's injury;
5. cumulative trial error requires reversal; and
6. the court denied his right to a jury trial under the Kansas and United States Constitutions when it determined his criminal history.

We will address the issues in that order.

*The trial court did not err by denying Mork's motion for a mistrial when Darnell testified that Mork had been in jail.*

The parties adopt opposite positions on this issue. Mork argues the testimony that he had been in jail and therefore had a prior criminal conviction was "highly prejudicial" because the jury would consider him more likely to commit crime and less credible and that this prejudice could not be cured. The State responds that Darnell's nonresponsive statement about Mork being "in jail" did not amount to a fundamental failure in the proceedings, and even if it did, the minimal prejudice from the isolated incident was cured by the court's admonition to the jury. The State also argues that since the jury convicted Mork of voluntary manslaughter rather than murder, that was proof that Mork's credibility to the jury was not diminished by Darnell's remark.

*Some additional facts provide a context for our ruling.*

Before trial, the State moved to admit evidence that Mork had been incarcerated during the fall of 2017, when Gibson moved into the house. The State's theory of the case was that Mork was angry at Gibson for the inappropriate things that happened at the house when Mork was in jail for a probation violation, including the drug use and the sexual advances toward Brittan. Rather than mention that Mork had been incarcerated, the parties agreed to instruct their witnesses to say he was "away" or "gone for a period of time."

At trial, on direct examination the State asked Darnell if he knew Mork. The next shows what was said at trial:

> "Q. How about Jeremiah Mork? Do you know someone named Jeremiah Mork?
> "A. Yeah. I briefly met him.
> "Q. How do you know him?
> "A. I don't know him. I met him through Tiffany.
> "Q. So you knew him to be Tiffany's boyfriend?
> "A. Yeah. That *he was in jail* and he got out and that's when Randy said that he needed—that the boyfriend came home and that he needed to move out."
> (Emphasis added.)

Outside the jury's presence, the trial court denied the request for a mistrial, finding that Darnell gave an unresponsive answer to a proper question. The court noted that it was early in the trial. Even though the court found Darnell's comment prejudicial, it found no fundamental failure in the proceedings and the prejudice could be removed or mitigated by an admonition to the jury.

So the court told the jury that Darnell's answer was nonresponsive to the question, struck the answer, and ordered the jury to disregard the answer. The court told the jury

6

that before trial, the court and attorneys agreed that the fact Mork had been in jail before this incident occurred was irrelevant. The court then asked the jurors to raise a hand if they believed they would be unable to disregard that statement. None of the jurors raised their hand. The defense did not ask for a limiting instruction at the end of trial, not wanting to draw any further attention to the comment.

When confronted with a situation like this, a trial court must decide two things. First, was there prejudicial conduct that caused a fundamental failure in the trial? If so, then the court must decide whether it is impossible to continue with the trial without injustice or whether the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. *State v. Miller*, 308 Kan. 1119, 1162, 427 P.3d 907 (2018).

To make that second decision, the court must assess whether the fundamental failure affected a party's substantial rights under the harmless error statutes, K.S.A. 2020 Supp. 60-261 and K.S.A. 60-2105, if a right guaranteed by the United States Constitution is not implicated; but if a constitutional right is implicated, the error must be assessed under the constitutional harmless error standard in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *State v. Logsdon*, 304 Kan. 3, 39, 371 P.3d 836 (2016). In other words, the court must decide how damaging the incident is.

In our review of such decisions, we look to see whether the trial court abused its discretion when deciding whether there was a fundamental failure in the proceeding and if the trial court abused its discretion when deciding whether the conduct caused prejudice that could not be cured or mitigated through admonition or jury instruction, which resulted in an injustice. *State v. Barlett*, 308 Kan. 78, 88-89, 418 P.3d 1253 (2018).

7

Prior decisions with similar facts to those presented here have upheld the denial of mistrials. In *State v. Rinck*, 256 Kan. 848, 852-54, 888 P.2d 845 (1995), after the State asked a witness how long he had known the defendant the witness answered, "'I've heard of his name and I've finally seen him after he got out of prison.'" Defense counsel asked for a mistrial, which the trial court denied. Our Supreme Court noted the statement by the witness was unsolicited; that the trial court had offered to give a limiting instruction, but the defense refused; and that no further mention of the defendant's prior record was made during the trial. The court found that, under all the circumstances, the single statement could not have affected the result of the trial, and the trial court did not abuse its discretion in denying the mistrial.

Once again, in *State v. Duhon*, 33 Kan. App. 2d 859, 863, 109 P.3d 1282 (2005), a witness in a drug case gave unsolicited testimony that the defendant had previously been arrested for drugs. The defense moved for a mistrial, which the trial court denied. The trial court instructed the jury to disregard the testimony. On appeal, this court affirmed the denial of the mistrial because the witness' statement was unsolicited, there was no further mention of the defendant's prior arrests or convictions, and the court admonished the jury to disregard the statement. 33 Kan. App. 2d at 863-64.

We think the trial court did a good job when it handled this situation. The remark about Mork having been in jail was unsolicited, it occurred early in a seven-day trial, it was isolated, and there was no mention of any specific prior offenses by Mork. The court immediately instructed the jury to disregard the statement and polled the jurors to ensure they would comply. The fact that Mork had been in jail was not mentioned again.

Plus, the evidence against Mork was strong. The only major dispute in the facts was whether Mork was being threatened by the men when he shot at them. The jury must have found Mork credible on this point to arrive at its verdict of voluntary manslaughter based on an unreasonable but honest belief that deadly force was justified. Overwhelming

8

evidence showed that Mork's use of force was objectively unreasonable. With this record, we see no possibility this error affected the jury's verdict. The trial court did not abuse its discretion in denying Mork's request for a mistrial.

We move now to the issue of whether the trial court should have told the jury why Triana was unavailable as a witness.

*The trial court properly refused to speculate to the jury about why Triana was unavailable as a witness. Juries should be told the truth, not speculation.*

Mork contends the trial court erred by denying his request to tell the jury that Triana was unavailable as a witness at trial because Triana had intentionally avoided service of a subpoena. Mork argues the court's refusal to instruct the jury that Triana knowingly avoided service of process infringed his right to present a complete defense because such information was relevant to Triana's credibility. We are unpersuaded that this is reversible error.

Before trial, the court found Triana was unavailable as a witness and that his preliminary hearing testimony could be presented at trial. The court found the State had done sufficient diligence to locate Triana. A detective testified that he and other officers had made several efforts to locate Triana and serve him with a subpoena. A woman at Triana's last known address told them that Triana knew they were looking for him to serve him with a subpoena but that he did not want to be contacted by them. An investigator for the district attorney testified he also tried to locate Triana to serve the subpoena. That investigator said that Triana's probation officer said Triana was a "no call/ no show." Triana had an ankle monitor for another case but cut it off. During trial, the State proffered that efforts were ongoing to find Triana.

9

Mork objected to the admission of the preliminary hearing testimony. He contended:

> "I think it goes to the witness' credibility that he appears to be trying to evade law enforcement and the court system. I think that goes to his credibility, so I wanted the jury to be aware of the fact that he's cut off an ankle bracelet and is apparently on the run."

The court refused Mork's request to tell the jury that Triana was unavailable as a witness because he had cut off his ankle bracelet and was on the run. The court explained:

> "I can't speculate. I don't know why he is unavailable. I can't say that he's unavailable because he cut off his ankle bracelet. That may be how he's unavailable, because he is—seems to be evading process, court process, here by way of serving a subpoena.
> "So I can't speculate to that. He's got another case that he had EMD on, not this case, so that makes it a little bit more removed from relevancy, frankly. I understand the defense wanting to cast him in that light, but that's a picture that I don't have facts to support. So I think the better course is to just be neutral, be factual, explain it in a way in which we're using facts that we know to be true and nothing more, nothing less. That way I'm not slanting anything one way or the other."

We view this as a request for a jury instruction and not a request for Mork to present evidence why Triana was unavailable. We exercise unlimited review of whether jury instructions are factually and legally required. *State v. Gentry*, 310 Kan. 715, 720, 449 P.3d 429 (2019).

Mork explains no legal basis for such an instruction. The trial court reasonably did not want to instruct the jury on a fact that was disputed. After all, Triana may have been avoiding the police because of his own criminal case.

10

We do not see any harm to the defense by any court refusing to offer speculations to the jury. Mork could present his defense that Triana had fired his weapon during the events. Scott testified he thought he had been shot by Mork and Triana. The private investigator testified he believed Triana had shot himself in the leg when trying to draw his pistol.

We hold that there is no reversible error here.

*We find no clear error by the court in failing to instruct the jury on the lesser included offense of reckless aggravated battery.*

Once again, the parties take an opposite position on this issue. Mork contends the trial court erred by failing to instruct the jury on the lesser included offense of reckless aggravated battery. He argues the instruction was appropriate because the evidence showed he acted in a defensive and panicked mindset and that he acted recklessly in shooting through the front door with a conscious disregard of the substantial risk of harm. In response, the State contends the instruction was not factually appropriate because Mork said that he shot at Scott and Triana and meant to hit them. The State also argues that even if it were factually appropriate, there is no reason to believe the jury would have reached a different verdict had the instruction been given.

Since Mork did not object to the failure to give the jury instruction, we must apply the clear error standard of review. We will only reverse if an error occurred and we are firmly convinced that the jury would have reached a different verdict if the instruction error had not occurred. At this point, Mork, as the party claiming a clear error, has the burden to show the necessary prejudice. See K.S.A. 2020 Supp. 22-3414(3); *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018).

We hold that a reckless aggravated battery instruction was legally appropriate here because reckless aggravated battery was a lesser degree of knowing aggravated battery. Mork was charged with aggravated battery under K.S.A. 2017 Supp. 21-5413(b)(1)(A). The aggravated battery statute states:

> "(b) Aggravated battery is:
>
> (1)(A) Knowingly causing great bodily harm to another person or disfigurement of another person;
>
> . . . .
>
> (2)(A) recklessly causing great bodily harm to another person or disfigurement of another person;
>
> . . . .
>
> "[g](2) Aggravated battery as defined in:
>
> (A) Subsection (b)(1)(A) is a severity level 4, person felony;
>
> . . . .
>
> (C) subsection (b)(2)(A) or (b)(3)(A) is a severity level 5, person felony." K.S.A. 2017 Supp. 21-5413(b) and (g).

Thus, a reckless aggravated battery instruction was legally appropriate. See *State v. Perez-Medina*, 310 Kan. 525, 535, 448 P.3d 446 (2019).

But that does not mean that it was error to fail to give this instruction.

*The question we must answer is whether the jury would have reached a different conclusion had the instruction been given?*

When evaluating whether a lesser included instruction was factually appropriate, we ask: "Is there some evidence when viewed in the light most favorable to the defendant that would allow a rational factfinder to find the defendant guilty of the lesser included offense?" *McLinn*, 307 Kan. at 324-25; see K.S.A. 2020 Supp. 22-3414(3). The

12

evidence need not be strong or conclusive. *State v. Maestas*, 298 Kan. 765, 779, 316 P.3d 724 (2014).

Knowing aggravated battery requires proof that the defendant acted while knowing that some type of great bodily harm or disfigurement of another person was "reasonably certain" to result from the act. K.S.A. 2020 Supp. 21-5202(i); *State v. Hobbs*, 301 Kan. 203, 211-12, 340 P.3d 1179 (2015). Reckless aggravated battery requires proof that the defendant "consciously disregard[ed] a substantial and unjustifiable risk" that harm would result to another person. K.S.A. 2020 Supp. 21-5202 (j); *State v. Trefethen*, No. 119,981, 2021 WL 1433246, at *5-6 (Kan. App. 2021) (unpublished opinion), *rev. denied* 314 Kan.___(August 31, 2021).

An example of a reckless aggravated battery is when someone shoots a gun into the air merely to frighten another person, but a bullet from the gun hits the other person. See *State v. Ochoa*, 20 Kan. App. 2d 1014, 1020-21, 895 P.2d 198 (1995), *overruled on other grounds by State v. Valentine*, 260 Kan. 431, 921 P.2d 770 (1996). Recklessness can include firing a gun blindly and randomly over a crowd or firing "warning shots" into the darkness but not intending to hit a person. See *Maestas*, 298 Kan. at 779-80.

For our analysis of this point, we will assume that the instruction was factually appropriate because we must deal with the doctrine of clear error. See *Perez-Medina*, 310 Kan. at 538.

With the facts in this record, we conclude that the jury would not have reached a different result. We are not dealing with young children playing with firearms here. When you shoot *at* another person, if you hit your target, you know that great bodily harm was reasonably certain to result. There was no question—Mork did not merely consciously disregard a substantial risk—he shot *at* Scott and Triana after wounding Gibson with the same gun. When he shot Gibson and watched him bleeding after falling

13

to the floor, Mork must have known that shooting at Scott and Triana was reasonably certain to result in great bodily harm to them as well.

Mork's and Scott's testimony was consistent at trial. Mork's testimony at trial was that when the men arrived, he saw that Triana had a holster on his hip and he "kind of had his hand on it." But Mork allowed the men into the house to gather Gibson's things. After Mork shot Gibson and Gibson went down, "one of his friends was running back toward the front door, so I shot him through the sliding glass door, the storm door. After I shot him then I went back to the bedroom." On cross-examination the State clarified:

"Q. So you shot through the front door at Ryan Scott?
"A. Yeah.
"Q. How many shots did you fire at Ryan Scott?
"A. Four maybe, five, or something.
"Q. Did you shoot at anyone else?
"A. No.
"Q. Did you shoot at Carlos?
"A. They were in the same direction.
"Q. So you were shooting at Carlos and Ryan Scott?
"A. Yeah."

Scott similarly testified that after he heard the initial shots, he moved toward the house and Mork pointed the gun at him. Scott kept moving toward the house until he heard more gunshots and the glass break, then he ran away. Triana was behind him when that happened.

In his interview with detectives, Mork said the men pulled guns on him first. He just remembered "pulling the trigger a bunch and running away." But he said he shot at two or three of the men. Mork said one of them was holding a rifle when he started shooting. Upon further questioning, he said he shot at Scott and Triana before they ran

14

away. Then, after Scott and Triana ran in opposite directions, he shot at both of them while they were running away.

The jury's verdict was appropriate under these facts. Mork never said he merely fired into the air to frighten the men away. He was clear that he shot *at* the men (and everywhere in between to be sure). He had wounded Gibson before he shot at Scott and Triana. He must have known that great bodily harm was reasonably certain to result from shooting at Scott and Triana. The court's failure to instruct on reckless aggravated battery was not clear error.

*We find no clear error when the trial court did not instruct the jury that Mork's actions must have been the proximate cause of Triana's injury.*

In trying to weave a concept from civil law—proximate cause—into his argument, Mork contends the trial court erred by failing to instruct the jury that his actions must have been the proximate cause of Triana's injury. He argues that if properly instructed, the jury could have found Triana's self-inflicted wound was an intervening act and acquitted Mork on that charge. We must provide more facts to give a fuller context for our reasoning on this issue.

The court instructed the jury that aggravated battery (great bodily harm) required that Mork "knowingly caused great bodily harm to Carlos Triana." The instruction also stated: "A defendant acts knowingly when the defendant is aware that his conduct was reasonably certain to cause the result complained about by the State."

To us, Mork contends the trial court should have given this instruction as well:

> "The fault of Triana is a circumstance to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of Triana's injuries."

15

He did not request this instruction at trial. That is why we must review this issue for clear error.

Whether Mork shot Triana was disputed in this trial. Mork told detectives he thought he had only hit Scott. Triana was hit in his right upper thigh. The wound consisted of two holes at a nearly vertical angle, about two inches apart. There was a red mark or stripe between the holes. The bullet went "through and through."

Schillaci testified he believed Triana had shot himself in the leg when trying to draw his pistol based on the stippling on his skin and the direction of the wound. Schillaci had 30 years' experience in law enforcement; he retired as a captain. He had worked countless gunshot cases and had been consulted as an expert. Schillaci testified that "quite often" someone carrying a gun at their side will reach for the gun and at the same time somehow pull the trigger, causing the gun to discharge.

But Scott testified he may have been hit by bullets from two different weapons because the holes of his wounds were different sizes and due to the angle of one of his wounds. He implied that both Mork and Triana had shot him.

Triana testified he wore his holster on his left side the night of the shooting, though he was right-handed. He testified he did not draw his weapon that night. A crime scene investigator testified she saw Triana's wound and there was no stippling around his wound to show it was inflicted at close range. Detective Ryan Schomaker testified there was no stippling or powder residue on Triana's pants to show that his wound was self-inflicted.

The Supreme Court has once used proximate cause analysis to hold there was a factual basis for a defendant's plea to premeditated murder when the defendant did not kill the victim. In *State v. Wilson*, 308 Kan. 516, 516-19, 421 P.3d 742 (2018), Wilson

16

broke into an apartment and began shooting. One of the residents of the apartment awoke, retrieved his handgun, and hid in his room. The victim, a guest of another resident, fled from the shooter into the resident's room, was mistaken for the shooter, and was shot by the resident. Wilson pled no contest to premeditated murder.

On appeal after the denial of Wilson's motion to withdraw the plea, the court stated: "The fact that Wilson did not fire the fatal shot is not dispositive. Instead, we must determine whether Wilson's attack *caused* Lowery's death." 308 Kan. at 522. The court then discussed proximate causation in the criminal context. The court held the mistake was foreseeable:

> "[W]hen a defendant acts with the requisite mens rea, and that act sets events in motion that lead to a victim's death, the defendant will be criminally liable for the death unless an unforeseeable event supersedes the defendant's act and becomes the sole cause of death, thus breaking the chain of proximate causation. And we have found it foreseeable that a dangerous crime—such as a drug sale or robbery—would provoke a violent or defensive response. Put simply, it is foreseeable that violence begets violence.
>     " . . . It is foreseeable that an active shooter will trigger the deeply embedded human fight or flight reflex . . . because '[t]he impulse for an individual to resist the sudden show of force, to defend himself or to come to the aid of a family member or loved one, is a basic human instinct.' [Citations omitted.]" 308 Kan. at 526.

We note that *Wilson* did not hold a proximate cause jury instruction was required in such a case, as that case did not involve a jury trial. The holding in *Wilson* is illuminating, but not controlling.

We focus, instead, on the elements instruction for aggravated battery which required the jury to find that Mork "knowingly *caused* great bodily harm to Carlos Triana." (Emphasis added.) In *State v. McCarley*, 287 Kan. 167, 180, 195 P.3d 230 (2008), our Supreme Court found the trial court did not commit clear error by failing to

17

give a proximate cause instruction for an aggravated battery offense when the trial court instructed the jury it must find the defendant recklessly "caused" great bodily harm. See *State v. Ladish*, No. 116,049, 2017 WL 4453279, at *11 (Kan. App. 2017) (unpublished opinion); *State v. Williams*, No. 114,778, 2017 WL 4558234, at *3 (Kan. App. 2017) (unpublished opinion), *aff'd on remand* 2019 WL 406296 (Kan. App. 2019) (unpublished opinion).

Mork has not met his burden to firmly convince the court that the jury would have reached a different verdict if properly instructed on proximate cause. Failure to give a proximate cause instruction in a battery case is not clear error where the harm to the victim was a foreseeable result of the defendant's crime. *State v. Romero*, No. 105,158, 2012 WL 2924537, at *10-11 (Kan. App. 2012) (unpublished opinion) (foreseeable that owner of car would intervene in carjacking and sustain physical injury in doing so).

The jury found Mork's belief—that his use of force was necessary—objectively unreasonable. Mork's theory was that Triana shot himself when pulling his pistol out of his holster. For that to be true, Triana's weapon must have been holstered until after Mork shot Gibson. There was no evidence of any gunfire before Mork shot Gibson. Thus, if Triana shot himself, it was because he pulled his weapon in response to Mork shooting Gibson. It was foreseeable that Triana would use his weapon to defend himself and Gibson after Mork shot Gibson. As explained in *Wilson*: "[V]iolence begets violence. . . . It is foreseeable that an active shooter will trigger the deeply embedded human fight or flight reflex." 308 Kan. at 526.

Was it foreseeable that Triana would shoot himself? That question was answered at trial. According to Schillaci, it happens "quite often." Triana's weapon was visible that night. Thus, Triana shooting himself was not an "unforeseeable event" that "supersedes the defendant's act and becomes the sole cause of death." *Wilson*, 308 Kan. at 526.

18

We see no reasonable possibility the jury's verdict would have been different if the jurors had been given a separate proximate cause instruction. There is no clear error here.

*Cumulative errors*

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when all of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine

- the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose;
- the nature and number of errors and their interrelationship, if any; and
- the overall strength of the evidence.

*State v. Hirsh*, 310 Kan. 321, 345-46, 446 P.3d 472 (2019).

In our view, the trial court did not err by refusing to grant a mistrial or by refusing to instruct the jury that Triana was unavailable because he was "on the run." When considered together, the failure to give a reckless aggravated battery or a proximate cause instruction did not change the outcome of the trial. Mork must have known that great bodily harm was reasonably certain to result from shooting at Scott and Triana. And the jury was instructed that Mork must have caused Triana's injury. Cumulative errors do not compel reversal here.

*The court did not deprive Mork of his jury trial rights.*

Mork contends that the use of his prior convictions to increase his sentence without proving the convictions to a jury beyond a reasonable doubt violated his rights under section 5 of the Kansas Constitution Bill of Rights.

19

The Supreme Court rejected this challenge in *State v. Albano*, 313 Kan. 638, Syl. ¶ 4, 487 P.3d 750 (2021), where the court held:  "Section 5 of the Kansas Constitution Bill of Rights does not guarantee defendants the right to have a jury determine the existence of sentence-enhancing prior convictions under the revised Kansas Sentencing Guidelines Act." With no indication that our Supreme Court is departing from this position, we are duty-bound to follow this precedent. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). Mork's sentence does not violate section 5 of the Kansas Constitution Bill of Rights.

Affirmed.