NOT DESIGNATED FOR PUBLICATION

No. 122,787

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LAJUAN SAMMIE LOUIS LOWERY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; MICHAEL D. GIBBENS, judge. Opinion filed January 14, 2022. Affirmed in part, reversed in part, and remanded with directions.

*Reid T. Nelson*, of Capital and Conflicts Appeals Office, for appellant.

*Megan Williams*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., MALONE, J., and BURGESS, S.J.

PER CURIAM: After biting two police officers while he was being apprehended for stealing a carton of cigarettes and a soda from a convenience store, Lajuan Sammie Louis Lowery was convicted of felony battery on a law enforcement officer, interference with a law enforcement officer, and theft. The district court permitted Lowery to represent himself, even though he displayed some strange behavior and had been previously diagnosed with schizophrenia. On appeal, Lowery argues the district court committed two instructional errors by failing to give instructions on the lesser included offense of misdemeanor battery on a law enforcement officer and the defense of mental disease or defect. He also asserts the court erred by permitting Lowery to represent himself because he was not competent to do so, and further contends that his waiver of his right to counsel

1

was not knowingly and intelligently made. We affirm in regard to the issues pertaining to the claim of instructional error, and we reverse and remand for further proceedings in regard to the issue of waiver of right to counsel.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 24, 2019, two Leavenworth County police officers responded to a call from a Family Dollar store, where a man had just taken a carton of cigarettes, a bottle of Coke, and some assorted junk food without paying. The Family Dollar employee told the officers that the man was wearing a green football jersey and informed them of the direction he headed, having left the store on foot.

Two other officers, who were already in the area for an unrelated matter and were stationed in an unmarked police car, observed the man in the green jersey stop on the porch of a house down the street from the Family Dollar. The officers who responded to the 911 call at the Family Dollar arrived soon after. The man, later identified as Lowery, saw the officers in the patrol car and began to run. As he ran through a grassy field, Lowery tripped and fell to the ground, and one of the pursuing officers went down on top of him. The officer immediately rolled Lowery over on his back and put him in an "arm bar." Lowery did not resist at first, but he soon escaped from the officer's grip, biting his arm, and attempted to stand up. The officer shouted, "'He just bit me.'" He then called for the other officers to tase Lowery, and another officer promptly attempted to do so. When she raised her Taser to stun Lowery, he grabbed her hand and bit her too, breaking the skin and causing her to bleed.

Once Lowery was tased, the officers were able to get him under control and placed him under arrest. After the officers had Lowery in handcuffs, they searched him and found the carton of cigarettes, two candy bars, a BodyArmor sports drink, and a bottle of cherry Coke. Several officers noted Lowery's "bizarre" behavior and commented that he

2

seemed intoxicated. One officer recalled that Lowery gave him a strange name when asked his identity, stated his date of birth was 01/01/0001, and explained that he was dead and that his "gravestone was in a cemetery." The second officer that Lowery bit disagreed, claiming Lowery's behavior was not "bizarre" and was much like any other encounter where a suspect attempts to evade arrest.

The State charged Lowery with one count of felony battery on a law enforcement officer, one count of misdemeanor battery on a law enforcement officer, interference with law enforcement, and theft. At his first appearance, Lowery informed the court that his real name was "Samuel Louis," that he was born in the 1800s, was Egyptian, and that he required a Bible to verify his identity. Lowery explained, "we need to get my identity straight, Your Honor, because they be doing the wrong name down, and I can't be responsible for anything other than the one Sammie Louis, because I'm not him."

After his first appearance, Lowery's appointed counsel requested an evaluation to determine Lowery's competency to stand trial. He had been similarly evaluated for another case the year before. The prior diagnostic evaluation noted that Lowery suffered from schizophrenia, that he claimed to experience visual and auditory hallucinations from a young age, and that he appeared to suffer from "Magical Thinking, Paranoia, Racing Thoughts, Ruminative Thoughts, Disorganized Speech, [and] Delusion." The evaluation in this case noted that Lowery was aware of the charges against him—he knew the charges included two counts of battery against a law enforcement officer. Moreover, the evaluation explained that Lowery did not appear to have any cognitive impairment, understood "basic legal concepts," and was capable of assisting in his own defense. Although the report noted the prior diagnosis of schizophrenia, it ultimately concluded that Lowery was competent to stand trial. The court accepted the findings outlined in the evaluation and found Lowery competent to stand trial.

3

Although he was appointed counsel, Lowery proceeded to file several pro se motions, including a motion of dismissal, a motion to reduce charges, a motion for a change of venue, a motion to impeach, a motion for work release, a motion to request a hearing, and a motion requesting discovery. Lowery also sent the court letters about his case. At his preliminary hearing Lowery attempted to raise these motions, and he specifically attempted to raise the defense of intoxication. The court informed him that the issue could not be addressed at that point. The court also denied Lowery's pro se motion to dismiss and proceeded with the hearing. After hearing the testimony of the officer who suffered a small laceration from Lowery's bite, the court found probable cause to support the felony battery on a law enforcement officer charge and bound Lowery over for trial.

About two weeks before the trial was set to begin, Lowery decided that he wanted to represent himself. The State did not appear at the hearing on the matter because "they were in a meeting and they didn't have anybody available." Upon taking up Lowery's request to represent himself, the district court advised him against doing so, noting that the same rules of evidence and procedure would apply to him and that the court would not aid him in his defense. The court further discussed with Lowery certain aspects of self-representation, such as whether to waive a preliminary hearing, how to plead, whether to have a jury trial, and whether or not he wanted to testify. Lowery confirmed that he understood. The court then asked Lowery how much schooling he had completed, to which Lowery stated he had graduated from high school and completed some college courses. Lowery also acknowledged that he had been previously diagnosed with paranoid schizophrenia, which he described as causing "[o]verthinking, just, um, thinking." But Lowery confirmed that he knew where he was, knew the date, and knew how long he had been held in the county jail. Lowery then waived his right to counsel, "[e]xcept for standby." The district court found Lowery's waiver was knowingly and voluntarily made and permitted him to represent himself.

After the court accepted his waiver, Lowery raised concerns about the conditions in the jail, noting that the building was moldy and was "eating away" at him. Lowery also requested that he be granted access to the internet or a law library and asked for "a evidence hearing." The court responded: "Well, we're gonna have an evidentiary hearing, Mr. Lowery, it's called a trial."

On the morning of trial, the State requested that the court reconsider its ruling permitting Lowery to represent himself. The rationale behind the State's request was to ensure Lowery's waiver had been properly taken. The court informed the State that "[t]he ruling that the Court made stands. Mr. Lowery can represent himself. The Court made at least a 15-minute inquiry, and followed a format that the Court has laid out based on case law that has been laid out by our appellate courts probably over the last 20 years." The court further explained that during the waiver proceedings it "went through [Lowery's] age, his education, his mental health status, [and] warned him that he should not represent himself."

Nonetheless, the court agreed to walk through the waiver of counsel and its warning about self-representation with Lowery again. The court then conducted a second waiver of counsel colloquy, receiving similar answers from Lowery as it had during the prior hearing. When the court advised Lowery that it was again firmly recommending that he choose not to represent himself, Lowery responded: "Yes, sir. I mean, this is something I want to do. It's like a lifetime dream is to overcome something that's standing in your path. Sometimes you have to take matters into your own hands. So I feel this is a very good learning experience for me." The court told Lowery that it was "a little bit concerned about [his] mental health status," and asked whether he had received any treatment. Lowery acknowledged this concern and stated that he had paranoia, schizophrenia, and hallucinations. He also explained that he intended to pursue a defense based on his mental health. Lowery stated that he had been found competent during his evaluation and believed that he could adequately represent himself, "as long as no one's

trying to harm me or like—you know, as long as I'm not threatened, . . . it doesn't—it doesn't trigger it unless like I'm in harm. See like. So I feel pretty comfortable." After listening to Lowery's responses, the district court reaffirmed its decision, finding Lowery knowingly and voluntarily waived his right to counsel. The State did not object to the court's decision but noted its opposition to Lowery presenting a mental disease or defect defense because he had not provided written notice. The court believed that Lowery had put the State on notice with his prior pleadings but noted "we'll take that up as we go along in the trial."

Upon the resolution of the self-representation issue, Lowery proceeded to represent himself throughout the pretrial and trial proceedings. He conducted voir dire, gave an opening statement, cross-examined the State's witnesses, argued several motions, handled the jury instruction conference, and gave a closing argument. Lowery also called several witnesses to the stand, before testifying himself with the aid of his appointed standby counsel.

On the second day of trial, the State renewed its objection to Lowery presenting a mental-health based defense. The State asserted that Lowery had filed several motions in which he noted that he intended to present evidence of intoxication as a defense. Those motions did not mention the defense of lack of intent due to mental disease or defect. Upon reviewing Lowery's prior filings and letters, the court agreed and ruled that Lowery could not present a mental disease or defect defense because he failed to provide written notice, did not have an expert witness to testify on the matter, and failed to establish good cause.

After hearing the evidence and the parties' arguments, the jury found Lowery guilty of felony battery on a law enforcement officer, interference with a law enforcement officer, and theft. The jury acquitted him of the misdemeanor battery on a law

6

enforcement officer charge. The district court sentenced Lowery to 19 months' imprisonment followed by 12 months of postrelease supervision.

Lowery appeals.

ANALYSIS

I. *Did the court err in failing to instruct on the lesser included offense of battery on a law enforcement officer?*

Lowery argues the district court erred in refusing to grant his request to give an instruction on the lesser included offense of misdemeanor battery on a law enforcement officer in regard to count 1 of felony battery on a law enforcement officer (the charge related to the second officer he bit). Ultimately, the jury convicted Lowery of the felony battery on a law enforcement officer charge. Lowery claims the court's failure to instruct on this lesser included offense was an error and requires reversal of this conviction and a retrial.

At the instruction conference, Lowery requested a misdemeanor battery of a police officer instruction based on the degree of harm the officer had suffered—he argued that the officer's bite wound was not severe enough to constitute bodily harm. As such, his claim of error has been preserved for this court's review. This court must next determine if the requested instruction was legally and factually appropriate, and if so, whether the failure to give the requested instruction requires reversal. See *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018).

Felony battery against a law enforcement officer is defined by K.S.A. 2020 Supp. 21-5413(a)(1), (c)(2)(B) as "[k]nowingly or recklessly causing bodily harm" to a "[u]niformed or properly identified state, county or city law enforcement officer."

7

Whereas misdemeanor battery against a law enforcement officer is defined by K.S.A. 2020 Supp. 21-5413(a)(2), (c)(1)(B) as "knowingly causing physical contact with another person when done in a rude, insulting or angry manner" to a "[u]niformed or properly identified state, county or city law enforcement officer." While there are several distinctions between the two crimes, misdemeanor battery on a law enforcement officer is a lesser included offense of felony battery on a law enforcement officer because it is a "lesser degree of the same crime." See K.S.A. 2020 Supp. 21-5109(b)(1). Accordingly, the instruction was legally appropriate.

Even if an instruction for an offense of a lesser crime is legally appropriate, a district court's failure to instruct on the lesser crime is only erroneous if the instruction was also factually appropriate under K.S.A. 22-3414(3). See *State v. Walker*, 308 Kan. 409, 424-25, 421 P.3d 700 (2018). And "[a]n instruction on a lesser included crime is factually appropriate if there is 'sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction.'" *State v. Becker*, 311 Kan. 176, 183, 459 P.3d 173 (2020). District courts have a duty to issue instructions on a lesser included offense that is established by the evidence, even if the evidence is weak or inconclusive. See K.S.A. 2020 Supp. 22-3414(3); *State v. Maestas*, 298 Kan. 765, Syl. ¶ 6, 316 P.3d 724 (2014).

For the lesser included offense of misdemeanor battery on a law enforcement officer to be factually appropriate, the essential question is whether there was evidence that Lowery knowingly caused physical contact or bodily harm. Here, the district court denied Lowery's request for the lesser included instruction because it found there was "ample evidence to support the instruction as to bodily harm." The court did not specifically address whether the evidence could have supported a finding of physical contact. Lowery contends that the officer only suffered a small scratch from his bite, and that this scratch could not constitute bodily harm. The State produced testimony from several officers about the bite wound as well as a picture of the wound the officer

8

suffered, which shows that Lowery broke the skin and caused a small laceration. The officer testified that she went to the hospital due to the potential exposure to Lowery's bodily fluids through the bite. While the evidence supported that Lowery caused an injury to the second officer's body by biting her, there was also evidence that he caused physical contact. That said, physical contact is, in most cases, a precursor of bodily harm. See *State v. O'Connor*, No. 118,519, 2019 WL 1868327, at *6 (Kan. App. 2019) (unpublished opinion).

The injury to the officer shows that Lowery broke the officer's skin, causing a laceration and her to bleed. This evidence is uncontested. While Lowery did cause physical contact, that contact was a precursor to bodily harm. Lowery's request for an instruction on misdemeanor battery of a law enforcement officer was not factually appropriate, and the district court did not commit error by not giving that instruction.

II. *Did the court err in failing to instruct on the defense of mental disease or defect?*

Lowery contends the district court erred by not instructing the jury on the defense of mental disease or defect. Despite its framing as an instructional error, Lowery's argument is more akin to a claim that the district court erred in denying him the right to present a mental disease or defect defense. Lowery concludes that the court's error was a denial of his fundamental right to present a defense. In fact, outside of stating the standard of review, Lowery does not provide substantive analysis related to the court's alleged instructional error.

a. *The court's decision to disallow the defense of mental disease or defect*

A district court's ruling that a defense of mental disease or defect could not be relied upon is reviewed for an abuse of discretion. *State v. Buehler-May*, 279 Kan. 371, 378, 110 P.3d 425 (2005); see *State v. Boyd*, 216 Kan. 373, 379, 532 P.2d 1064 (1975)

9

(reviewing district court's decision to disallow an insanity defense pursuant to K.S.A. 22-3219 for an abuse of discretion). But "[a] claim that a defendant was denied the constitutional right to present a defense raises a question of law subject to de novo appellate review." *Maestas*, 298 Kan. at 780. While a defendant is entitled to present their theory of defense, "that right is subject to statutory rules and caselaw interpreting the rules of evidence and procedure." 298 Kan. at 781. Our Kansas Supreme Court has held that "the notice requirements of K.S.A. 22-3219 do not deprive a defendant of his or her constitutional due process right to defend against the State's case or the constitutional right to a fair trial." *Buehler-May*, 279 Kan. at 381.

In Kansas, it is "a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the culpable mental state required as an element of the crime charged. Mental disease or defect is not otherwise a defense." K.S.A. 2020 Supp. 21-5209. To present the defense at trial, however, a defendant must serve written notice of their intent to argue that they lacked the requisite mental state element due to a mental disease or defect with the prosecuting attorney and the court. K.S.A. 22-3219(1). That notice "must be served and filed before trial and not more than 30 days after entry of the plea of not guilty to the information or indictment." K.S.A. 22-3219(1). A district court may permit a later filed notice for "good cause shown." K.S.A. 22-3219(1). The statute applies "whenever a defendant seeks to prove lack of the required mental state as a result of a mental disease or defect." *Maestas*, 298 Kan. at 782.

Lowery did not specifically raise the matter of a mental disease or defect defense until the first day of trial. That morning, the court conducted a second waiver of counsel colloquy and inquired about Lowery's mental health condition—ostensibly to ensure that his condition would not affect his ability to represent himself. Lowery responded that he had not received any treatment since he entered the county jail, but that he "did request mental health being a defense [at pretrial]" and stated that "all parties have knowledge of my—of my mental health conditions." Lowery then requested a jury instruction based on

10

"Kansas Statute 22-3219, defense of lack of mental state." The court informed Lowery that instructional issues would be taken up after all the evidence was presented and stated: "If there is evidence that would indicate that that instruction should be given, I will give it." The State argued that Lowery should be disallowed from presenting a mental disease or defect defense because he had not provided statutorily required written notice. Lowery disagreed, contending he had provided notice in several of his pro se filings and letters to the court. The court initially concluded that Lowery had "put the State on notice by prior pleadings, even though it's not exactly the way a lawyer would have done it." But it noted that "normally when you have a lack of culpability defense due to mental deficiency, you have to have expert testimony in order to show that in court. And we'll take that up as we go along in the trial."

As the trial began, Lowery mentioned his mental health and referenced his bizarre behavior during his struggle with the police several times. During voir dire, Lowery spoke to the jury about mental health issues, noting "that's going to be a big factor in this issue." In his opening statement, Lowery described being in "a fairytale land" and having a "mental breakdown" during the incident and explained that he had "a mental history [and] mental issues, too." He also claimed that he had been intoxicated during the altercation with the police and explained:

> "That's why I chose to represent myself. So you can see me in my right state of mind, and how important it is to push off all distractions to hear it and understand all the doubts in this case and see—and see how these cops failed to follow protocol when a person is having a mental breakdown."

As the case continued, the State began raising objections as Lowery questioned witnesses about whether his behavior was bizarre or odd—again arguing that Lowery had not provided adequate notice because his prior letters and pleadings did not indicate that he would rely on the defense of mental disease or defect.

11

The court refrained from ruling on the matter until the second day of trial. After reviewing Lowery's pleadings and the pretrial order, the court found Lowery had not filed written notice and that the pretrial order specifically stated that he would not be relying on the defense of "insanity" but was relying on "[i]ntoxication." Lowery claimed that he had given the State "verbal—oral notice at pretrial that we would be using mental—mental defense," and further contended that the State "will be at fault for not taking the proper procedures when [it] knew that mental defect was—was a logic—was logical in this case." Lowery's pretrial filings only indicated that he was going to present the defense of intoxication and had been rendered unconscious during the struggle with the police. Lowery then argued that he had established good cause to permit the presentation of a mental health defense because of his "bizarre behavior" and evidence that he "didn't even know the present time or day at the time of the offense." The court concluded that Lowery failed to provide written notice and had not established good cause. The court also noted that Lowery did not have an expert ready to testify regarding his mental illness.

In order to succeed on appeal, Lowery must demonstrate that the district court abused its discretion in precluding him from presenting a mental disease or defect defense. That is, he must show "that the trial court's decision was 'arbitrary, fanciful, or unreasonable. If reasonable persons could differ on the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.'" *Buehler-May*, 279 Kan. at 378-79.

Lowery did not file a written notice within the applicable statutory timeline prior to trial, nor did he make a showing of good cause after that statutory window had closed. Although the court initially thought Lowery had put the State on notice with his prior pleadings, it later reversed its position after reviewing the State's motion and Lowery's letters and pleadings. On appeal, Lowery argues the pretrial letters he had written constituted sufficient written notice. These letters did not actually state that Lowery

12

intended to assert the defense that he lacked the requisite mental state due to a mental disease or defect. Lowery did not attempt to file a written notice at trial. The court did not make an error of fact or law, and it did not act unreasonably in concluding Lowery failed to provide written notice to the State under K.S.A. 22-3219.

Lowery argues that he nevertheless established good cause for the district court to excuse his failure to file written notice and should therefore have been permitted to present a mental disease or defect defense. At trial, Lowery contended that the police reports of his "bizarre behavior besides drunkenness or intoxication" constituted a sufficient basis to find good cause to allow the defense. On appeal, Lowery asserts that he showed good cause because his mental deficiencies were evident and because he was blindsided by the court's ruling allowing him to discuss his mental health during voir dire and his opening statement, and even questioned several witnesses about his behavior on the first day of trial. Lowery essentially argues that the prejudice resulting from having the defense taken away from him midtrial constitutes good cause in and of itself. Lowery also contends this prejudice was amplified because he had informed the court he intended to argue that he acted unconsciously. But, as noted above, Lowery did not assert his intention to argue that his mental illness presented him from forming the requisite intent for the charged crimes, and the admission of such evidence is only permissible under the statutory framework of K.S.A. 22-3219. Even if there was some indication that Lowery intended to rely on his mental state as a defense, a showing of good cause was required due to the lack of notice. Lowery's prejudice-based argument does not establish good cause.

While the district court could have made a ruling on the admissibility of this evidence earlier in the trial, its ruling was not based on a mistake of fact or law in determining Lowery failed to provide written notice. Moreover, it cannot be said that its decision was arbitrary and unreasonable. Lowery does not address the fact that he did not have an expert witness prepared to testify regarding his mental disease and how it

13

negated his ability to form the culpable mental state required as an element of the crimes charged. The only proffer of evidence Lowery made was that several of the police officers thought he had acted strangely. Although some evidence was introduced regarding his strange behavior, and the pretrial evaluation noted several mental health issues, Lowery did not have evidence that would have provided a sufficient basis to properly assert the elements of a mental defect defense. Ultimately, Lowery's belief that he had provided notice and his argument that he suffered prejudice as a result of the disallowance of the defense did not establish good cause.

The district court did not abuse its discretion when it denied Lowery's request for a mental defect defense on the first day of trial because he failed to provide statutorily required written notice under K.S.A. 22-3219 and had no expert witness to support the defense. The court did not act unreasonably in finding Lowery failed to establish good cause to excuse his failure to provide notice. Because the court did not abuse its discretion, its application of the procedural notice requirement of K.S.A. 22-3219 did not infringe on Lowery's right to present a defense.

b. *The court's failure to instruct on the defense of mental disease or defect*

Since Lowery frames the issues relating to his claim of a mental health defense as an instructional error, we will address this aspect of his appeal.

This court analyzes jury instruction issues under a three-step process:

> "'(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal;
> (2) considering the merits of the claim to determine whether error occurred below; and
> (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

14

The first and third steps are interrelated. Whether a party preserved a jury instruction issue will affect the reversibility inquiry—if a party fails to object or request an instruction, K.S.A. 22-3414(3) limits this court's review to whether the failure to give the instruction constitutes clear error. 307 Kan. at 317-18.

Here, Lowery did not request instructions on the defense of mental disease or defect after the court ruled he was not allowed to rely on the defense. But he did request the instruction on the morning of trial.

Under the second step, this court must determine whether an error occurred, i.e., if the instruction was legally and factually appropriate. *Williams*, 308 Kan. at 1451. Lowery's argument focuses almost entirely on the fact that certain evidence of his odd behavior and mental health issues was introduced during the first day of trial, i.e., that the instruction was factually appropriate. Assuming the instruction would have been factually appropriate, it was not legally appropriate under the circumstances. Because the court concluded that Lowery failed to provide notice and had disallowed evidence of his mental defect or disease, such evidence was not admissible.

Evidence of mental illness is admissible only to the extent it relates to the defendant's ability to form the requisite intent to commit the crime, and a defendant is only permitted to present such evidence upon complying with K.S.A. 22-3219(1). Here, the district court did not abuse its discretion in denying Lowery's request to present such a defense. Accordingly, it would not have been legally appropriate to instruct the jury on a defense that Lowery was not entitled to rely on. The district court did not err by not providing the jury with an instruction on the defense of mental disease or defect.

15

III. *Did the court err in determining that Lowery was competent to represent himself?*

Lowery argues the district court erred by allowing him to represent himself because his mental illness prevented him from meeting the competency standard set forth in *Indiana v. Edwards*, 554 U.S. 164, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008). He asserts that although he was competent to stand trial, he was not competent to represent himself, and the district court abused its discretion in permitting him to do so.

The right to assistance of counsel and the related right to self-representation are legal questions subject to de novo review. *State v. Bunyard*, 307 Kan. 463, 470, 410 P.3d 902 (2018). But this court reviews a district court's decision regarding a defendant's mental competency to represent themselves for an abuse of discretion, keeping in mind the constitutional principles that decision implicates. *State v. Burden*, 311 Kan. 859, 866, 467 P.3d 495 (2020) ("[W]hen applying the facts to a standard to determine mental competency to represent oneself, we review the trial record under an abuse of discretion standard."). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021).

Because the right to counsel and the right to self-representation present an "obvious potential tension," district courts "'must indulge "every reasonable presumption against waiver" of the right to counsel.'" *Bunyard*, 307 Kan. at 470. Yet, "[w]hether a lawyer could better represent a defendant . . . is not the question for the court to decide." 307 Kan. at 470-71. And a violation of the right to self-representation is structural error, not amenable to harmless error analysis. 307 Kan. at 471.

In *Edwards*, the United States Supreme Court held that the basic threshold where a district court may rightly deny a defendant's request to waive counsel arises where a defendant has a severe mental illness. 554 U.S. at 175, 178 (using term "'mental

16

derangement'"). The *Edwards* Court further noted that states are permitted to use a higher competency standard for self-representation than the standard used to determine a defendant's competency to stand trial. 554 U.S. at 178. Kansas has not adopted a heightened competency standard for self-representation. In *Burden*, the Kansas Supreme Court acknowledged the "severe mental illness" threshold but declined "to define the condition that might induce a trial court to take the step of refusing a defendant's request to waive counsel." 311 Kan. at 869; see also *State v. McCall*, 38 Kan. App. 2d 236, Syl. ¶ 1, 163 P.3d 378 (2007) ("No separate finding of mental competence, apart from competence to stand trial, is necessary before a defendant may exercise the right of self-representation."). In part, this is because the judge who presides over the competency hearings "'will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant.'" *Burden*, 311 Kan. at 866 (quoting *Edwards*, 554 U.S. at 177).

The question this court must determine then is, considering the particular facts and circumstances of Lowery's mental capacity, did the district court abuse its discretion when it found he was competent to represent himself at trial?

It is undisputed that Lowery at the very least had been previously diagnosed with schizophrenia and that he displayed some peculiar behavior both before and after he was permitted to represent himself. On appeal, Lowery contends these two factors were a "beacon" that should have convinced the district court that he could not handle the task of representing himself.

Although Lowery, like Edwards, was diagnosed with schizophrenia and showed signs of delusional thinking, he was not hospitalized or taken for treatment during the pendency of the case, although he did request treatment while in county jail. In fact, the evaluation performed by The Guidance Center noted that despite Lowery's schizophrenia diagnosis, the hallucinations, and his bizarre behavior, he did not appear to have any

17

cognitive impairment, appeared to understand "basic legal concepts," and was competent to stand trial. During both the first and second waiver colloquies, the district court raised concerns about Lowery's mental health. Lowery acknowledged that he had paranoia, schizophrenia, and hallucinations. But he described the effects of his mental illness as causing "[o]verthinking," and he reiterated his desire to represent himself. Lowery further explained that he had been found competent after his evaluation and that he believed he could adequately represent himself so long as he did not feel threatened. While Lowery displayed some strange behavior, he was able to appropriately respond to the court's questions about what self-representation would entail and the consequences of waiving counsel. He remained steadfast in his desire to represent himself throughout. The record shows that the district court engaged with Lowery, observing and evaluating his behavior throughout these waivers. Although Lowery suffered from mental illness, it is not clear that these issues met "the basic threshold set out in *Edwards* for the circumstance where a state might deny the constitutional right of self-representation," i.e., *severe* mental illness. *Burden*, 311 Kan. at 869; see *State v. Warren*, No. 110,949, 2015 WL 4879034, at *10 (Kan. App. 2015) (unpublished opinion) (rejecting *Edwards*-based competency claim after concluding the record "has not shown any incapacity due to mental illness or incompetency"). Although the competency evaluations noted some mental health concerns, by and large the record does not show that Lowery was incompetent—that is, it does not appear that Lowery's mental illness was so debilitating that he was unable to conduct the necessary trial proceedings.

Lowery argues that along with his diagnoses, his behavior should have led the district court to emphatically deny his right to self-representation. The record shows that Lowery displayed some strange behavior. The State points out that despite this bizarre behavior, Lowery was able to conduct voir dire, argue pretrial motions, give an opening statement, cross-examine witnesses, call his own witnesses, handle the jury instruction conference, and give a closing argument. Lowery was also able to organize an intoxication defense, argue points of law, and file numerous motions. While many of

18

these efforts proved unsuccessful, a "'defendant's "technical legal knowledge" is "not relevant" to the determination whether he is competent to waive his right to counsel.'" *Burden*, 311 Kan. at 865. Although Lowery plainly displayed some eccentricities and frequently made odd statements, he was able to obtain an acquittal on one of the charges against him, suggesting the jury did not find him completely ineffective as counsel. In other words, Lowery proved able to carry out the basic tasks needed to present his defense and conduct trial proceedings.

District courts are tasked with the difficult duty of making a realistic account of a defendant's mental capacities when determining whether to permit or deny the right to self-representation. Here, Lowery's schizophrenia diagnosis and his sometimes-bizarre behavior perhaps made the decision a close one, but Lowery has not shown that the district court abused its discretion by finding that he was sufficiently competent to represent himself.

IV. *Did the court err in allowing Lowery to represent himself when it failed to set forth the charges, penalties, or defenses during the waiver of counsel colloquy?*

Finally, Lowery argues that he did not knowingly and intelligently waive his right to counsel because the district court failed to adequately advise him of all of the appropriate information before accepting his waiver of counsel.

Neither the United States nor Kansas Constitutions explicitly provide for a right of self-representation. That right has been implied from the right to counsel granted in the Sixth Amendment to the United States Constitution. *Faretta v. California*, 422 U.S. 806, 821, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). To exercise the right to self-representation, a defendant must make a knowing and voluntary waiver of the right to counsel. 422 U.S. at 835. In other words,

19

"'[a] criminal defendant who before trial clearly and unequivocally expresses a wish to proceed pro se has the right to self-representation after a knowing and intelligent waiver of the right to counsel. A knowing and intelligent waiver requires that the defendant be informed on the record of the dangers and disadvantages of self-representation. The choice is to be made "'with eyes open.'"' [Citations omitted.]" *Bunyard*, 307 Kan. at 470.

In *Burden*, our Kansas Supreme Court reiterated a three-step framework for district courts to utilize when determining whether a defendant's waiver is knowing and intelligent. 311 Kan. at 863 (citing *State v. Buckland*, 245 Kan. 132, 138, 777 P.2d 745 [1989]).

"First, a court should advise the defendant of the right to counsel and to appointed counsel if indigent. Second, the defendant must possess the intelligence and capacity to appreciate the consequences of his or her decision. And third, the defendant must comprehend the charges and proceedings, punishments, and the facts necessary for a broad understanding of the case. [Citation omitted.]

"To assure the defendant appreciates the consequences of waiving representation by counsel, *Buckland* suggests the court explain that the defendant will be held to the same standards as an attorney; that the judge will not assist in or provide advice about presenting a defense; and that it is advisable to have an attorney because many trial techniques, evidence rules, and the presentation of defenses require specialized training and knowledge." *Burden*, 311 Kan. at 863-64.

The *Burden* court went on to explain that a district court is not required to use any specific checklist. Rather, a district court should "weigh whether a defendant has knowingly and intelligently waived the right to counsel by examining the circumstances of each case." 311 Kan. at 864; *State v. Armstrong*, 240 Kan. 446, 453, 731 P.2d 249 (1987). Finally, the *Buckland* court stated that for a district court to obtain a knowing and intelligent waiver of the right to counsel, the trial judge's inquiry should show that the defendant "'comprehends the nature of the charges and proceedings, *the range of*

20

*permissible punishments*, and any additional facts essential to a broad understanding of the case.' [Citation omitted.]" (Emphasis added.) 245 Kan. at 138.

This court exercises unlimited review over questions involving the interrelated rights to counsel and self-representation. *Bunyard*, 307 Kan. at 470. And the determination of whether the waiver of the right to counsel was knowingly and intelligently made depends on the facts and circumstances of each case. *Buckland*, 245 Kan. at 137. Here, Lowery contends the district court's failure to inform him of the charges, penalties, and potential defenses during the waiver of counsel colloquy rendered his waiver invalid in that his waiver was not knowingly made.

In both of the district court's waiver discussions with Lowery, it advised him against self-representation and explained that he would be held to the same rules of evidence and procedure that a lawyer would be required to follow. These admonitions are directly derived from the first prong suggested in *Buckland*. The court further explained that it could not aid Lowery in his defense and strongly advised him against representing himself—the second prong of *Buckland*. Lowery acknowledged each of these admonitions and confirmed that he still wished to represent himself. The district court also enquired about Lowery's mental health and educational history. Lowery stated that he graduated from high school and had completed some college, and while he acknowledged his mental health struggles, he expressed his confidence in his ability to represent himself.

On appeal, Lowery does not contest that he was advised of these matters, nor that he appeared to comprehend the court's warnings about the pitfalls of waiving his right to counsel. Rather, he contends the court's colloquy was deficient under the final portion of the *Buckland* framework, specifically that the district court did not ensure that Lowery understood the nature of the charges and proceedings, the range of punishments, and any essential facts necessary to a broad understanding of the case. Specifically, Lowery

21

asserts the court was required to read each of the charges against him, inform him that he was facing 19 months of potential imprisonment, and advise him of all of the possible defenses he could rely on at trial. Without being given pieces of information, Lowery argues, there is no basis to find that his waiver was knowingly made.

Lowery appears to have understood a broad understanding of the nature of the case despite the fact that the district court did not read him the charges or explain the penalties as contemplated by *Buckland.* Prior to waiving counsel, Lowery filed numerous pro se motions that—although ultimately fruitless—demonstrated that he understood the nature of the proceedings and the offenses he was charged with. Among these filings, Lowery moved to reduce the charges, to change venue, to dismiss the case, asked for work release pending trial, and moved for discovery. Lowery further was able to provide a list of witnesses he wished to subpoena, made requests for access to a law library to aid in his defense, and ensured his access to proper audio/visual equipment so that he could present his case at trial.

The State argues that while the district court did not specifically advise him of the penalties during the colloquy, Lowery requested a nonprison sanction in his pleadings, which suggests that he understood the potential punishment he was facing. These motions demonstrate that despite the lack of any specific reading during the colloquy, Lowery had a reasonably broad understanding of the nature of the case.

While *Buckland* discusses a reasonable "broad understanding" may suffice in some respects in regard to a waiver, it also specifically states that a defendant must be advised of the nature of the charges and the range of penalties. While the State argues that Lowery was advised of the nature of the charges against him at the first appearance, there is nothing in the record to show that Lowery was ever advised of the range of punishments associated with those charges. The district court did an admirable job in dealing with a situation that was outside of the ordinary. However, there is simply no way

22

around the requirement that a defendant must be made aware of the range of punishments associated with the crimes charged. Without such information, a knowing waiver cannot be made. This case must be reversed and remanded for further proceedings. On remand, the district court must either appoint counsel to represent Lowery, or Lowery must knowingly and intelligently waive his right to counsel if he chooses to represent himself.

Affirmed in part, reversed in part, and remanded with directions.